## STAFFORD v. UNITED STATES.
### No. 45082.

Court of Claims.
Nov. 3, 1947.

Horace S. Whitman, of Washington, D. C., for the plaintiff.

Frank J. Keating, of Washington, D. C., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before JONES, C. J., and HOWELL, MADDEN, WHITAKER and LITTLETON, JJ.

JONES, Chief Justice.

This suit arises out of a contract to do the landscape work, including the planting of many thousand trees and shrubs, in connection with an extensive housing project in Cleveland, Ohio.

The several claims upon which plaintiff here seeks to recover include amounts to cover the increased cost of nursery stock and the increased cost of labor and field overhead alleged to have resulted from a delay of approximately 11 months in giving plaintiff notice to proceed with the performance of his contract, plus a proportion of his general office overhead during such period of delay. The gravamen of his complaint with respect to these items is that these added costs were not within the contemplation of his bid which was based upon his investigation of the cost of material and labor at the site of the work immediately prior to the submission of his bid in September 1936, nor within his reasonable expectation that the material and labor would be used in the winter-spring planting season of 1937 rather than the following season when he was directed to proceed.

The Instructions to Bidders accompanying the Invitation for Bids on the landscape work had cautioned plaintiff as a prospec-

tive bidder that he should visit the site of the work and inform himself fully as to the conditions under which the work was to be done. The Special Conditions of the specifications had acquainted him with the fact that the superstructure contract for grading and general preparaion of the project site for work under the landscape contract had been awarded to the George A. Fuller Company, and that the time for completion of the landscape work would commence to run from October 29, 1936 "which is the contemplated date of completion of the superstructure contract, or from the actual date of completion of such contract if the same is completed later than October 29, 1936". Giving heed to these cautionary provisions plaintiff, prior to bidding on the landscape work, visited the site where he conferred with the Government's local project manager and project engineer and with representatives of the Fuller Company, regarding the current status of the superstructure work and the date when it would be sufficiently completed for the landscape work to begin.

Plaintiff made inquiries at the local offices of the Ohio State Employment Service and the Works Progress Administration and talked with local labor union officials regarding the labor situation in the area where his work would have to be done. He was advised that the Fuller Company's work was behind schedule, and that the landscaping could not proceed before January 1, 1937, but that certain sections of the site would be ready for plaintiff's work by that time. He was assured by the United States Employment Service through which he would be required to secure substantially all his labor, and by the Works Progress Administration from whose relief rolls most of such labor would have to be taken, under the requirements of section 8 of the General Conditions of the contract specifications, that there was plenty of labor available at the minimum rates of wages set forth in the specifications, namely, at 50 cents an hour for common labor and 65 cents an hour for plantsmen; that the Works Progress Administration was paying the same rate for common labor as that stated in the specifications, and that there were no labor unions in the Cleveland area controlling anything in plaintiff's line of work. This latter was confirmed by the labor union officials with whom plaintiff talked. On the strength of this information he secured quotations on the nursery stock and topsoil which would be required for the landscape work, and submitted his bid based upon his assumption that such materials would be required in the winter-spring planting season of 1937 and that his labor costs could be measured in terms of the minimum wage rates set forth in the specifications for the work.

The foregoing facts, together with the fact that the Government's invitation to bid for the landscape work was issued early in September 1936, afford slight ground for any presumption that plaintiff, in signing the contract with defendant on October 20, 1936, undertook to protect himself, by means of a higher price exacted for the work, against the possibility of having to secure the required labor and material under such conditions and such price structure as might obtain some eleven months later. Cf. Wells Bros. Co. of New York v. United States, 254 U.S. 83, 87, 41 S.Ct. 34, 65 L.Ed. 148.

It is a reasonable conclusion that the parties had in mind that the landscape work would be commenced shortly after the first of the year and the placing of the topsoil and the planting of the nursery stock accomplished during the spring season.

For reasons not disclosed by the evidence, the Fuller contract was not completed until September 10, 1937, and as a consequence notice to proceed with the landscape work was not given to plaintiff until September 11, 1937. It does appear that the Fuller Company was operating with union labor, whereas plaintiff contemplated performance of his contract with nonunion labor; and that, knowing the probable consequence of starting his work at the project site prior to completion of the Fuller work, plaintiff requested of defendant that his notice to proceed be withheld until the Fuller contract had been completed in its entirety. The significance of this request as it bears upon the question of delay in giving plaintiff notice to pro-

ceed is somewhat lessened by the fact that the request was made on December 4, 1936, when, as a result of further visits to the site and further talks with representatives of the Fuller Company and the defendant, plaintiff expected the Fuller Company's work would be completed by the first of February 1937. Why this expectation was not fulfilled has not been shown.[1]

### Delay in Notice to Proceed— Increased Costs

 By the time plaintiff was given notice to proceed with his contract the burden of performance had substantially increased over what it would have been had he been able to place the topsoil and to do his seeding and planting in the spring of 1937. He was compelled to obtain new commitments for nursery stock at an added cost of $4,109.50, due to the refusal by many of the nursery stock dealers to fill plaintiff's orders at the prices previously quoted for spring delivery.. The labor situation had materially changed. Shortly before plaintiff was permitted to go ahead with his work a union of landscape workers had been organized in the area. As early as December 1936 the Works Progress Administration had increased its wage rates for laborers on the relief rolls from 50 cents to 60 cents effective December 21, 1936, and the rates for other classifications of workers, such as landscapers, was increased in January 1937. Because of certain union activities in the fall of 1937, such as the placing of a picket at the work site, and other acts of intimidation, interpreted by the federal employment services as constituting a strike condition, plaintiff was unable to secure the requisite certification of a sufficient number of laborers for his job from the federal employment services, and by November 1937 had been forced to come to an agreement with union officials under which he paid wages in excess not only of the minimum rates set

forth in the Special Conditions of the Specifications, but in excess, as well, of the new rates for relief workers which had been established by the Works Progress Administration subsequent to plaintiff's bid on the landscape work. His added payroll expense on the job resulting from the foregoing amounted to $4,051.05, of which $2,335.13 constituted the excess over the WPA rates prevailing at the time plaintiff performed his contract. Of his general office overhead during the interim period, from January 1, 1937, to the time when he was allowed to proceed with the work, $447.52 thereof was fairly chargeable to the necessity of holding himself in readiness to perform his contract.

The sum total of these facts clearly establishes a case of hardship on the part of the contractor, who entered into his contract in good faith, apparently calculating his bid price in reliance upon labor and material scales obtaining a year earlier. The increased expenses were not his fault. He was compelled to pay them in order to perform his contract. At the same time they do not show the Government to have been at fault. There is no showing that the defendant's representatives were lacking in diligence in making the landscape work available at an earlier date than September 11, 1937. The latter were not required to be more astute than the contractor himself in estimating when the site would actually be ready for plaintiff, nor in anticipating what changes might occur in the meantime.

The situation presented here is clearly not that which confronted us in Harwood-Nebel Construction Co., Inc., v. United States, 105 C. Cl. 116, and more recently in George A. Fuller Co. v. United States, 69 F.Supp. 409, 108 Ct. Cl. 70. We there dealt with instances of delay to the contractor resulting not from the exercise by the Government of some right reserved to itself but with delays occasioned by its want of diligence in making the work avail-

---

[1] Some light is thrown upon the situation by the facts presented to us in George A. Fuller Co. v. United States, 63 F.Supp. 768, 105 Ct.Cl. 331, wherein the contractor on the superstructure work sought to be reimbursed by the Government for the increased labor costs it had been compelled to incur as a result of having to meet union demands for substantially higher wages during the course of its work than those in effect when it entered into its contract.

able to the contractor. In the present case neither party was responsible for the substantial delay in the starting time for plaintiff's work which brought with it the added cost which plaintiff suffered.

The Special Conditions of the specifications (paragraph 2 (d) Section 1) state that " 'notice to proceed' with the landscape work will be given when the work of the Superstructure Contract in one or more sections of the site has been completed or has progressed to the stage deemed advisable by the contracting offcer." As noted hereinbefore, plaintiff himself had requested that the notice to proceed be withheld until the superstructure contract was entirely completed. No modification of his request by plaintiff at a later date has been shown. There is nothing upon which to fashion a breach of the above contract provision, beyond the disappointment of the contractor in the mutual expectations of the parties that the starting date of plaintiff's work would not extend more than a few months beyond the "contemplated date of completion of the superstructure contract" recited in Section 3 of the Special Conditions. The Government's postponement of the notice to plaintiff to proceed until completion of the superstructure contract pursuant to the reservation of right in the contract conditions to do so clearly distinguishes the instant case from United States v. Wyckoff Pipe & Creosoting Co., 271 U.S. 263, 46 S.Ct. 503, 70 L.Ed. 938, upon which plaintiff strongly relies.

It is meaningless to argue, as counsel for the contractor seemingly does, that because there was no express provision in the contract exempting the Government from liability for damages from delay not contemplated by the contract, the Government should respond in damages to the plaintiff for his increased expenses, notwithstanding the absence of any showing that the Government had unnecessarily interfered to prevent plaintiff's work from proceeding within a reasonable time. To hold the Government liable under such circumstances would be tantamount to holding that the Government had unequivocally warranted that the site would be ready for plaintiff to proceed within that time which the parties might reasonably contemplate at the time they entered into the contract. Such a ruling would not only fly directly in the face of the plain words of the contract provision quoted above respecting the starting date for plaintiff's work, but it would extend the Government's contractual obligations far beyond the scope to which it was unsuccessfully sought to extend them in United States v. Blair, 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039, and United States v. Howard P. Foley Co., 329 U.S. 64, 67 S.Ct. 154.

### Increase in Minimum Wage Rates

 With respect to plaintiff's claim for reimbursement of the amounts expended by him for labor in excess of the amounts he would have had to pay if such labor could have been hired at the minimum rates prescribed in Section 6 of the Special Conditions, the contention is made that recovery should be had as to a portion thereof irrespective of the question of the defendant's delay in giving plaintiff notice to proceed. This has to do with such portion of said excess labor costs of $4,051.-05 as represents the difference between the rates enumerated in Section 6 of the Special Conditions, and the increased rates established by the Works Progress Administration for similar types of workers subsequent to the time plaintiff entered into his contract. On December 10, 1936, the Works Progress Administration issued an order effective December 21, 1936, increasing the wage rates to be paid by employers of relief labor in the Cleveland area to 60 cents an hour for laborers and on January 22, 1937, issued a further order effective January 25, 1937, increasing the wage rate of laborer-in-charge and landscaper, Grade B, to 71½ and 71 cents an hour, respectively. Even if plaintiff had proceeded with his work in the winter and spring of 1937 as originally contemplated by the parties, and had been compelled to hire his labor at these increased rates, his labor costs would have exceeded by $1,715.92 what he would have had to pay had he been able to secure the necessary men at the minimum rates listed in Section 6. Plaintiff's argument is that disregarding any question of damages for delay, he is entitled to be reimbursed for such sum. Article 19 of the

contract provided that the contractor's payrolls should be prepared in the manner prescribed by the Works Progress Administration and subject to its inspection; paragraph (a) of Article 20 required the contractor to secure at least 90 percent of his labor from the public relief rolls except as otherwise authorized by the Works Progress Administration; and paragraph (c) of Article 24 provided that "this contract shall be subject to administrative orders of the Works Progress Administration which may issue from time to time relating to the administration and operation of regulations heretofore or hereafter issued pursuant to the Executive order."

We agree with plaintiff as to this item. The language of the contract is very clear. Article 18 (a) required plaintiff to pay the minimum wages specified.

Article 19 (a) is as follows: Art. 19. (a) The minimum wage rates herein established shall be subject to change by the Administrator. In the event that as a result of fundamental changes in economic conditions the Administrator from time to time establishes different minimum wage rates from those specified in the contract or contracts for work on the project, the contract price shall be adjusted accordingly by the parties thereto so that the contract price to the contractor under any contract or to any subcontractor under any subcontract shall be increased by an amount equal to any such increased cost or decreased in an amount equal to such decreased cost.

The language of this article is both clear and mandatory. Defendant undertakes to escape the consequences of this provision by asserting that the particular administrator, to wit, the Emergency Administrator of Public Works, known as PWA, did not technically push the button that increased the minimum wages and therefore defendant is not bound. The facts are that the next paragraph of the contract required the plaintiff to use WPA labor. It also had an administrator, but that of course was the wrong administrator. The one was the right hand and the other the left hand of the Government, and the right hand was not supposed to know what the left hand was doing.

The plaintiff was caught between the two provisions and was bound by both of them. Automatically, the wages on the project were increased by the terms of the contract and the matter of paying them became a binding obligation and by the terms of the same contract plaintiff was entitled to an adjustment. To hold otherwise would divert the purpose of the law from the ends of justice and strap it to a pure legalism. The decision in the case of United States v. Beuttas, 324 U.S. 768, 65 S.Ct. 1000, 89 L.Ed. 1354, does not apply to the facts of this case. The Beuttas case dealt with separate successive contracts by different companies. These provisions are in the same contract of one operating company.

The defendant also invokes the provisions of subdivision (e) of section 6 of the Special Conditions. This provision is a good defense to that portion of the increased labor payments which plaintiff made above the minimum level, but has no application to the increased payments necessitated by defendant's increasing the minimum wage requirements which plaintiff was compelled to pay. York Engineering & Const. Co. v. United States, 62 F. Supp. 546, 103 C. Cl. 613, 656; Certiorari denied 327 U.S. 784, 66 S.Ct. 700, 90 L.Ed. 1011.

Since the contract is specific on this point the failure to allow plaintiff this increase constituted a breach of the contract. It is not a labor dispute but a plain contract obligation. Perhaps an administrative officer more keenly aware of the mutual obligation of the parties to a Government contract to deal fairly with one another would have recognized the realities of the situation and recommended to the Administrator of Public Works an increase in the scale of minimum wages on the project to conform to the minimum rates established for workers on the relief rolls in the same area, together with a consequent adjustment of the contract price. The Director of Housing did not do so, however, but contented himself with standing on the literal words of paragraph (e) of section 6, choosing to disregard the action by the administrator of WPA by

which plaintiff under the terms of the contract was also bound.

The plaintiff is entitled to recover $1,715.-92 on this item.

### Increase in Cost Due to Inspector's Requirements Regarding Planting and Inspection.

■ Two items of plaintiff's claim are founded upon certain requirements of the Government's inspector on the job with reference to the preparation of pits and a personal inspection of the subsequent planting of each tree, shrub and vine, and hedge therein, which requirements plaintiff contends were arbitrary and unreasonable, and necessitated extra handling of topsoil and delay in the plaintiff's work, resulting in additional cost to him in performing his contract.

The gist of the complaint with regard to the planting pits is that the inspector, as a condition precedent to approving plaintiff's partial-payment estimates, compelled plaintiff when digging the pits to fill the same to the finished grade surface with topsoil, instead of placing in them only sufficient topsoil to fill the excavations when subsequently occupied by the root structures, after allowing for a proper foundation and a saucer-like formation at the surface as called for in the specifications. This resulted in some surplus of topsoil at the pits, entailing additional work, first, in placing the extra topsoil in the pits, and second, in removing it and disposing of it elsewhere when the planting was done. We have only the plaintiff's estimate as to how much actual surplus topsoil developed from this method of operation, based upon his estimate of how much topsoil would be displaced by the root structure. The extra expense he claims to have incurred is dependent in turn upon the correctness of this estimate, and upon his further estimate of the amount of labor required in the handling of such excess material.

We may concede that the inspector's requirements resulted in hardship to plaintiff, and may well have resulted in expense to him that should have been avoided.

Assuming without deciding that the requirement laid down by the inspector as to filling the pits to finished grade surface was work outside the requirements of the contract documents, we are still faced with the fact that no protest in writing stating the basis of the contractor's objection was submitted to either the inspector or the contracting officer. We are not at liberty to disregard the plain words of paragraph 2 of section 5 of the General Conditions [1] in considering whether the recovery of resulting damages is proper. In United States v. Joseph A. Holpuch Co., 328 U.S. 234, 239, 66 S.Ct. 1000, 1003, 90 L.Ed. 1192, which dealt with a contractor's failure to follow the contract provision with respect to appeal from decisions of a subordinate Government officer, it was said:

"But Article 15 is something more than a dead letter to be revived only at the convenience or discretion of the contractor. It is a clear, unambiguous provision applicable at all times and binding on all parties to the contract. * * *

"It follows that when a contractor chooses without due cause to ignore the provisions of Article 15 he destroys his right to sue for damages in the Court of Claims. That court is then obliged to outlaw his claims, whatever may be their equity. To do otherwise is to rewrite the contract."

The plaintiff is not entitled to recover on this item whatever may be its merit otherwise.

■ As to the inspector's requirement that he personally supervise the planting

---

[1] No complaint on the part of the Contractor that work demanded of him is outside the requirements of the contract documents, or that any record or ruling of the Contracting Officer is unfair, shall be considered or entertained unless a protest is submitted in writing to the Contracting Officer within ten days after receipt of demands for such work or of such record or ruling stating clearly the basis of the Contractor's objections. Unless the Contractor files such protest as above provided, he will be deemed to have accepted, and shall be conclusively bound by, such demand, record or ruling.

of each tree, a different story is presented. Article 6 of the contract provides: All inspection and tests by the Government shall be performed in such manner as not to unnecessarily delay the work.

There were about 10,000 trees and shrubs to be planted in addition to the hedges. The space to be covered amounted to about 15 blocks one way and 3 blocks the other. The planting season was limited. The contract contained a liquidated damages provision of $25 per day for failure to complete the work within the time specified. There was but one inspector. In the face of these facts the inspector insisted on seeing every tree and shrub planted. If a tree was planted when he was not there he would require digging up and replanting. With two or more crews working this caused idleness and excess expense. The plaintiff asked for more inspectors. This was refused. He asked for the privilege of planting without the necessity of this personal presence of the one inspector. This also was refused. He was between the rock and the whirlpool. If he went ahead and planted without waiting for the personal presence of the inspector, he risked the ire of the inspector who said in effect "You will do it my way or you will have to undo it and do it over again." If he employed only one crew he faced the assessment of liquidated damages.

We have no doubt of his sincerity, but that an inspector in these circumstances would make the requirement of personal supervision of every detail of planting, notwithstanding the delay and expense to plaintiff, is enough to stagger credulity. It shows an almost complete disregard for the rights of the plaintiff as well as a lack of appreciation of defendant's obligation under the plain provisions of the contract. The work was unnecessarily delayed. The unproductive payroll thus resulting amounted to $638.86 which plaintiff is entitled to recover.

### Cost of Maintenance During Delay in Acceptance of Work

■ Plaintiff contends that he was entitled to final inspection of his work under the contract not later than July 21, 1938, and that defendant breached the contract by wrongfully delaying the final inspection and requiring plaintiff to continue the maintenance until September 10, 1938.

This item of claim has its origin in a dispute between the parties as to when plaintiff completed the operation of Protection and Care, and more particularly the last reseeding of lawn areas, as provided for in section 9 (g) of the specifications for landscape work. The determination of this issue is less a question of fact than a question of what meaning shall be ascribed to the reseeding requirements in section 9 (g), in view of the fact that reseeding requirements are also contained in section 12 (b) covering maintenance. Such determination is merely preliminary to ascertainment of the proper meaning to be given to the provision of section 9 (b), that "including 'Protection and Care' as specified in this section and except for 'Maintenance' as specified in section 12, all lawn operations shall be completed at least 30 days prior to the date of completion of the work," as this provision affects the contractor's right to final inspection and acceptance of his work and termination of his obligation to continue maintenance of the same.

Section 31 of the General Conditions provided that when the contractor's work was practically completed he should give the Contracting Officer not less than 10 days' written notice that, on a definite date, the work would be ready for final inspection. Plaintiff gave such notice to the project manager on June 27, 1938, designating July 11, or any time between that date and July 14, as suitable for inspection. The project manager on June 29, 1938, referred the notice to H. L. Campbell, acting Chief of Federal Construction, United States Housing Authority, in Washington, D. C., who was the person then authorized by the Federal Emergency Administrator of Public Works to have general direction of the work under the contract. Receiving no response to this notice by July 13, 1938, plaintiff on that date wrote directly to Campbell, complaining of the delay and requesting inspection not later than July 21, 1938. The reply to this letter on July 19, 1938,

from Campbell, writing for the Administrator, and in effect denying plaintiff's request, is set forth in finding 13, together with plaintiff's response thereto on July 20, 1938, fully restating his position and insisting upon July 21 as the date for final inspection.

The difficulty experienced by the parties in determining the proper meaning to be given section 9(b) with reference to the matter of final inspection is apparent in the arguments advanced by the respective parties in these two letters, and in the vacillation on the part of defendant's representatives, in repeatedly setting and resetting the inspection date, as revealed in the closing paragraphs of plaintiff's letter of July 20. By July 19 defendant apparently had concluded to take the position that so long as any reseeding of lawns was being done plaintiff would be held to be still engaged in the operation of lawn care under section 9(g), and required to wait both the 28 days' minimum specified in that provision and the 30 days mentioned in section 9(b), before becoming eligible to final inspection. Neither the ultimate result that plaintiff could seemingly never reach that goal so long as any necessity for reseeding called for in section 12 (Maintenance) might continue, nor plaintiff's letter of July 20 undertaking to bring some reason into the interpretation of the contract requirements by reviewing the facts and pointing out that there was no dispute between the contractor and defendant's local representative at the project, but only a misinterpretation on Campbell's part as to what sort of reseeding occurred on June 21 (whether the reseeding under lawn care under section 9, or reseeding under section 12), was sufficient to sway the decision contained in Campbell's letter of July 19. On the 20th he wired plaintiff: "Our letter dated July nineteenth represents our final decision concerning date of completion."

It is to be noted from the letters of July 19 and 20 that by the latter date plaintiff had become reconciled to defendant's insistence that section 9(b) required an elapse of not less than 30 days following completion of the period of lawn care called for in section 9(g), before final inspection could be had, or in other words, that plaintiff was committed to a minimum of 30 days' lawn maintenance under section 12(b) following completion of lawn care, notwithstanding this section specified no minimum period such as was provided for lawn care by section 9(g). Defendant gives to the rather ambiguous language of section 9(b) what appears to us to be a very strained and unnatural meaning. Viewing its language in the light of what is required of the contractor under 9(g) and 12(b) and in connection with the description of ultimate obligation on the part of the contractor at the time of completion of the entire contract work, as set forth in section 13 (finding 13), it appears probable that section 9(b) was intended to require that all lawn operations except the maintenance specified in section 12 should be completed at least 30 days prior to the termination of the 365 days allowed for performance of the contract. The several provisions of 9(b) other than the one under discussion are all concerned with directing how the contract time shall be employed, rather than with describing the measure of the various operations to be performed. Considering the fact that the operations required under 9(g) and 12(b) are in many respects nearly identical, and necessarily overlapping and of a continuous nature, and the further fact that 9(b) specifies a minimum period of time whereas 12(b) is silent in this respect, the interpretation ascribed to 9(b) by defendant provides little less than a hidden pitfall wherein the contractor may be entangled in an obligation to continue watering, weeding, mowing and reseeding for a full 30 days after the entire lawn area is first covered with an even, thick growth of grass, as called for in 9(g), or after all planting and lawns are in growing and healthy condition, as required under section 13, at the time of completion of the work.

Quite independent of our view that the manner of computing the time for final inspection set forth by Campbell in his letter of July 19 was not warranted by the contract provisions above discussed, we must conclude that the rejection of plaintiff's request that final inspection be made by July 21 was a breach of the contract.

This latter date was a full 30 days after plaintiff claimed to have completed the period of Protection and Care called for under section 9(g). We are satisfied that the defendant's eleventh-hour cancellation of the earlier advice to plaintiff that final inspection would take place on July 21, was founded upon defendant's failure to rationalize the continuing requirements as to reseeding provided for under 9(g) and 12(b), and upon its refusal to distinguish between the "last reseeding of those areas or spots which do not show proper germination or growth" required under Protection and Care, and the obligation to "keep all lawns in a healthy, growing condition by reseeding of same where necessary" called for under Lawn Maintenance.

There is no evidence of any attempt on the part of the Contracting Officer, or on behalf of the Federal Emergency Administrator, to disprove the assertions contained in the third paragraph of plaintiff's letter of July 20 that all of the lawns had received over four weeks' care prior to June 21, nor to meet plaintiff's further assertion that the Contracting Officer's contrary conclusion was based upon his misinterpretation of reports from defendant's local representatives concerning certain reseeding done subsequent to that date.

On the other hand, we find in the various steps taken by these local representatives at the project, in the making of a "punch list" of items for correction by the landscape architect on June 27 following his inspection of the work in company with the Senior Inspector, in the project manager's referral to Washington on that same day of plaintiff's request for inspection without questioning its propriety, and in his subsequent wire of July 16 to plaintiff that defendant's Washington office had been notified establishing July 21 as the date of final inspection, support for the conclusion that plaintiff's work had advanced to the stage contemplated by section 31 of the General Conditions when request was made for final inspection. We likewise find in the periodic delays and postponements by defendant after July 20 in the fixing of a final inspection date, even well beyond the lapse of the 58 days contended for in defendant's letter of July 19, evidence of an obvious reluctance on the part of defendant to take over the burden of maintenance of the landscape work during the hot, dry months of the year, coupled with an inclination to leave with the plaintiff as long as possible not only this burden but the responsibility for providing protection against acts of vandalism on the part of the tenants of the project as well.

We cannot but conclude, in view of all these circumstances, and in the light of the reasons assigned for refusing the inspection requested, that the curt rejection on July 20 of plaintiff's request without inquiry into the merits of plaintiff's contentions and without regard to its consequent effect of perpetuating for some considerable time thereafter the necessity for plaintiff to continue protection and maintenance of the landscape work, was an arbitrary and unreasonable ruling on the part of the contracting officer. To hold otherwise would have the effect of requiring plaintiff to spend the summer with a hose in his hand waiting for Government red tape to slowly unwind, or for the contracting officer to have a change of heart and decide plaintiff had been punished enough. If we accept defendant's construction the contracting officer by standing pat could have required plaintiff to water and reseed the lawn indefinitely.

Since Campbell purported to be writing for the Administrator when he rejected the request for final inspection no further "avenue of relief" in the administrative machinery provided by the contract for adjudicating disputes remained open to plaintiff. His only course was to carry on the task of protection and maintenance until the defendant saw fit to ultimately release him from this obligation, and to thereafter seek relief in the courts. Under such circumstances we hold that the provision contained in section 5 of the General Conditions that the decision of the contracting officer as to the proper interpretation of all drawings and the specifications should be final, subject only to appeal in case of dispute as provided in Article 15 of the contract, cannot be employed to oust the jurisdiction of this court to legally construe those provisions of the specifications which

are in seeming conflict, and to determine the question of law, whether on the facts found, and within the proper meaning of the contract obligations, defendant, by requiring plaintiff to continue maintenance and incur expense beyond his obligation under the contract, had committed a breach thereof.

The additional cost to plaintiff of maintenance from July 21 to September 10, 1938 was $2,114.05, and plaintiff is entitled to recover this amount.

### Excess in Price of Change Orders

In his petition plaintiff claimed to be entitled to the sum of $250 on account of certain change orders issued by defendant during the performance of the contract. The pertinent facts with regard to these change orders are set forth in findings 14 and 15. All but one of these change orders were accepted by plaintiff without written protest. Change Order No. 8 was signed by plaintiff under protest. The merit of the protest was not established by the evidence. No appeal was taken from the contracting officer's decision with respect thereto, in compliance with Article 15 of the contract. No argument in support of this item of claim appears in plaintiff's brief. Plaintiff is not entitled to recover on this item.

The plaintiff is entitled to recover the sum of $4,468.83. It is so ordered.

HOWELL, MADDEN, WHITAKER, and LITTLETON, JJ., concur.