Littleton, Judge,
delivered the opinion of the court:
On February 14, 1941, plaintiff, an individual trading as Sigfried Olsen Shipping Company of San Francisco, California, was notified by defendant, acting through the General Purchasing Officer of The Panama Canal, that he was the low bidder and had been awarded a contract to furnish and deliver large quantities of lumber to defendant at Balboa,
. Canal Zone. Plaintiff had been engaged for a number of years in the exporting and shipping business, and at the time of this award was fulfilling a number of contracts with defendant and with private concerns in the Canal Zone.
The formal contract, dated February 17, 1941, provided that plaintiff should furnish and deliver to defendant, free of charges, on the docks at Balboa, Canal Zone, lumber of eleven different classes, totalling 6,235,000 feet board measure (gross), and 500,000 linear feet of moulding and 500,000 linear feet of strips, for a total consideration of $260,885.00, subject to a two percent discount for prompt payment. Delivery was to be made in two lots, each consisting of 50 percent of the quantity specified in each class, the first lot to be delivered on or before April 23,1941, and the second lot to be delivered between May 15 and May 25, 1941. The contract provided in Article.4 that the materials were to be subject to inspection during manufacture, but final inspection and *133 acceptance of the materials were to be made after delivery. The contract also contained as Article 5 the Standard Form Delays-Damages clause"[1] and as Article 12 the Standard Form Disputes clause.[2]
The Purchase Conditions set forth in the invitation for bids and made a part of the contract contained the following pertinent provisions:
3. Default. — In case of default, the Government may procure the articles or services from other sources and hold the contractor responsible for any excess cost occasioned thereby as well as any other damages. *****
17. In view of shipping- conditions now existing on the Pacific Coast, the requirement in Paragraph 1 that shipment be made by steamer of American Registry is hereby waived if shipment is made through Pacific Coast-ports.
*134 . 18. Changes in Ocean Freight Bates. — By the submission of a bid hereunder and its acceptance by The Pan-, ama Canal it is agreed that if any increase or decrease in ocean freight rates applicable to the articles, materials, supplies or equipment furnished is made by the Steamship Conference'operating, in the trade involved, or is prescribed by the United States Maritime Commission, the contract price will be increased or decreased accordingly: Provided, That any such increase in the contract price shall not be more'than the amount by which the ocean freight charges actually paid exceed the ocean freight charges based on Steamship Conference rates in effect on date of opening' of bids: * * *.
At the time the contract was entered into the ocean freight rate promulgated by the Pacific Coást/Panama Canal Freight Conference for the carriage of lumber to the Canal Zone was $18 per 1,000 feet board measure (net) on shipments under 50,000 feet, $17 per 1,000 feet board measure on shipments oyer 50,000 feet and up to 750,000 feet, and open to negotiation on shipments above 750,000 feet. • ’ These rates had been in effect since August 20, 1940, and remained in effect until January 20, 1942. Surfaced lumber such as that included.in the present contract is sold .on the basis of the “gross” measurement of the rough-lumber before surfacing; however, shipping charges are based upon the “net” measurement which is the actual board measure content of the lumber in its surfaced state.
Promptly upon receipt of the notice of award of the contract plaintiff placed purchase orders with mills in the Pacific Northwest. On February 19,1941, plaintiff placed an order for the major portion of the lumber to be supplied under this contract with Pope & Talbot Lumber Company of Portland, Oregon, for delivery half- in early April,.and the remainder in early May, and requested that production be expedited.
The first shipment of lumber by plaintiff applicable to this contract arrived at the Canal Zone on April 2, 1941, aboard the Hamlin F. McCormieh,&n.d consisted of 1,040,312 feet board measure (gross) of lumber plus 588,000 linear feet of moulding and strips. This vessel also carried-1,648,362 feet board measure (net) of lumber consigned by plaintiff to private concerns in. the Canal . Zone and the Republic of *135 Panama, 42,767 feet board measure (net) of lumber consigned- by plaintiff on other contracts with The Panama Canal, and about 1,100 cubic feet of cargo other than lumber consigned by plaintiff to private concerns in the Canal Zone.
Previous to this, on March 21, 1941, while loading the vessel Florida Maru with lumber for the fulfillment of a previous Panama Canal contract, plaintiff discovered that space for additional lumber was available, whereupon plaintiff secured and loaded 110,836 feet board measure- (gross) of siding of the grade called for by the contract in suit. However, due to lack of time, this lumber was neither inspected by representatives of-The Panama Canal prior to shipping, nor marked with the contract number as required by the terms of the contract. Following the arrival of the Florida Maru at Balboa on April 10,1941, plaintiff on April 15 sent an invoice to the contracting officer for this shipment of uninspected lumber. However, on June 3, 1941, plaintiff notified the contracting officer that upon the arrival of the Florida Maru at Balboa, this siding had been sold to a contractor in the Canal Zone.
Although under the terms of the contract fifty percent of the quantity of lumber in each class was to be delivered by April 23, 1941, the only lumber which had been received in the Canal Zone by April 10, 1941, for application to this contract was the shipment on the Hamlin F. McCormick. As a result, on April 10, the contracting officer wrote to plaintiff stating that “considerable acceleration in the rate of shipment” would be necessary to meet the contract delivery dates, and requesting that plaintiff forward a list of proposed shipments. Following this letter a series of telegrams passed between the parties in which the information furnished by plaintiff as to shipping dates was vague and unsatisfactory to the contracting officer. On May 2,1941, plaintiff sent the contracting officer a telegram in which he complained that the steamship lines were quoting rates on Conference vessels ranging from $24 to $28 per thousand feet board-measure which were $7 to $11 higher than the freight rate used at the time plaintiff submitted his bid, and that no space was available even at those prices. Plaintiff also requested a seven *136 dollar increase in the unit price of lumber, and referred to clause 18 of the purchase conditions as authority for such an increase. The contracting officer sent the following reply:
W-3 5077 LUMBER REURTEL THIRD RESPONSIBILITY EOR COMPLETING CONTRACT WITHIN REQUIRED TIME AND ACCORDING TO ITS TERMS IS THAT OE CONTRACTOR AND HE IS REQUIRED TO ADOPT ALL REASONABLE MEANS TO THAT END WILL NOT APPROVE INCREASE UNIT PRICE OE LUMBER CHANGES IN OCEAN EREIGHT RATE WILL BE HANDLED IN ACCORDANCE WITH PARAGRAPH EIGHTEEN PURCHASE CONDU TIONS ATTACHED TO SCHEDULE.
Another exchange of telegrams followed in which the contracting officer again urged plaintiff to expedite shipments and remarked that he was unable to understand plaintiff’s difficulty as other contractors were obtaining space.
Following this series of telegrams plaintiff delivered two lots of lumber for application to the present contract. The Lake Frances, a vessel under charter to plaintiff, arrived at Balboa on June 3, 1941, with a cargo consisting of 426,000 linear feet of moulding applicable to this contract* 16,765 feet board measure (net) of lumber for other Panama Canal contracts held by plaintiff, 1,478,049 feet board measure (net) of lumber consigned to various private concerns in the Canal Zone, 61,093 pounds and also 15,870 cubic feet of other cargo. This shipment completed delivery of the moulding and strips. On May 15,1941, the sailing date of the Lake Frances, plaintiff’s supplier was in a position to furnish additional lumber for application against this contract had plaintiff desired it. The Oliver Olson, also under charter to plaintiff, arrived at Balboa on July 4, 1941, carrying 1,717,707 feet board measure (gross) of lumber applicable to this contract as well as 823,451 feet board measure (net) of lumber for private concerns.
During this period plaintiff also made efforts to obtain time charters of other vessels to move the lumber covered by this contract. About May 1, 1941, plaintiff commenced negotiations with the Moore-McCormack line for the charter of the Mormacsim. However, negotiations for this vessel fell through when defendant refused to permit this vessel to unload lumber at Cristobal, Canal Zone, rather than Bal *137 boa, unless plaintiff would assume the expense of shipping the lumber across the Isthmus to Balboa.
Early in May 1941 plaintiff chartered the Tropicus, a vessel flying the Panamanian flag, subject to the condition that the owners of the vessel would obtain a British navicert. The navicert was a document indicating that the cargo of a vessel sailing from a neutral port corresponded to the manifest. It served as a form of commercial passport and avoided the necessity of a search of the cargo by a belligerent nation. The navicert system was inaugurated by the British in November 1939, following the outbreak of World War II, primarily for the facilitation of inter-neutral trade between the United States and specified European neutral countries. Despite diligent efforts by the owners of the Tropicus and later by plaintiff, the navicert was never issued and plaintiff was unable to use the Tropicus although he had gone to the trouble of loading 400 tons of cement in the bottom of the vessel to increase its stability and make possible the carriage of an increased load of lumber.
In the latter part of May 1941 plaintiff also chartered the TV. E. Chamberlin to carry approximately two and one-half million feet of lumber to Balboa, but this vessel ran aground before being turned over to plaintiff and did not become available again until August 1, 1941. From the date of the award of the contract through July 26, 1941, plaintiff made shipments of lumber to private concerns on the vessels of the Norwegian-flag Fruit Express Line, also on the Stanley A. Griffiths, the Vinland, and the Cape St. Martin. The quantities shipped on these vessels is not disclosed by the evidence. On July 12, 1941, the Lalce Frances sailed on its second voyage to The Panama Canal, carrying for private concerns in the Canal Zone and in the Bepublic of Panama 1,194,837 feet board measure (net) of lumber, and about 300,000 pounds of pig lead under another contract with The Panama Canal, but no lumber applicable to this contract.
Because The Panama Canal was in urgent need of the undelivered lumber, and because plaintiff would not make any definite commitments as to shipping dates for the undelivered balance of the lumber, the contracting officer, beginning about May 1,1941, commenced attempts to secure *138 tbe balance from other suppliers. However, the- suppliers were unwilling to undertake the short-term delivery sought by the contracting officer. In the first part of July 1941 the contracting officer obtained through the Maritime Commission shipping space aboard the Oregon, scheduled to sail in early August, and aboard the Idaho, scheduled to sail in early September, which he offered to plaintiff. This space had been obtained from a merchant shipping pool which had been created pursuant to the April 30, 1941, request of the President of the United States for use in moving critical materials needed in the war effort. Attempts to assemble the pool were begun about the middle of May which was the date set for the original completion of plaintiff’s contract, but it was August before ships like the Oregon began to operate in this service. Plaintiff was unable to take advantage of this space because Pope & Talbot, plaintiff’s supplier, could not furnish sufficient amounts of lumber by this date.. Thereafter, on July 18,1941, the contracting officer requested Dant & Russell, Inc., to submit a quotation on all the undelivered lumber for shipment on August 8, 1941. Dant & Russell, Inc., on July 24,1941, submitted a quotation on all the items except a flooring item for shipment one-half aboard the Oregon, sailing August 8,1941, and the balance on the Idaho, sailing one month later. Dant & Russell, Inc., requested prompt acceptance by defendant in order to permit their supplier to commence cutting the lumber by Monday, July 28,1941.
On Saturday afternoon, July 26, 1941, the contracting officer called plaintiff’s office and extended to plaintiff a final opportunity to make a definite statement of future shipments, including a shipment for the August 8 sailing of the Oregon. Although plaintiff requested that he be given until the following Monday to furnish this information, the contracting officer refused and stated that it was essential that he receive a definite guarantee that afternoon or his chance to repurchase the lumber would have passed. Finding 21. The contracting officer then informed plaintiff that his right to proceed under the contract was terminated, and this was confirmed shortly thereafter by telegram. On the same afternoon the contracting officer notified Dant & Russell, Inc., of *139 the award of a contract for the balance of the lumber, except the item of flooring which Dant & Kussell, Inc., had not bid upon. ...
Meanwhile, on July 11, 1941, the Cadaretta sailed for Balboa with 517,964 feet board measure (gross) of lumber shipped by plaintiff applicable to this contract, 1,382,299 feet board measure (net) for private concerns, and 280,001 feet board measure (net) applicable to other contracts with, defendant. While the Cadaretta was at sea plaintiff’s right to proceed was terminated, but, immediately upon the arrival of the Cadaretta at Balboa on July 29,1941, the contracting officer contacted Dant & Bussell, Inc., to see what items it would agree to exclude from its contract. Thereafter, with the consent of Dant & Bussell, Inc., plaintiff’s right to proceed was restored as to most of the lumber abroad the Cadaretta, 463,587 feet board measure (gross) being accepted, and 54,377 feet board measure- (gross) being rejected.
On August 13,1941, plaintiff submitted a letter of protest to the contracting officer stating that the termination was contrary to the terms of the contract because the delays were Attributable to unforeseeable events beyond the plaintiff’s control, and that the contracting officer had been notified of these events as they had transpired. There was no reply to plaintiff’s letter, but on August 21, 1941, the contracting officer wrote to plaintiff stating that the undelivered item of 193,556 feet board measure (gross) of flooring had not been repurchased, and that if plaintiff could give assurance that the entire amount would be delivered within a reasonable time, consideration would be given to the. restoration of plaintiff’s right to proceed as to this item, including the 6,840 feet board measure (gross) of flooring which had been shipped aboard the W.' B. Chamberlin on August 9, 1941. An invoice for the flooring which had been shipped aboard the Chamberlin was submitted to the contracting officer, but the flooring was sold by plaintiff to private concerns upon its arrival at the Canal Zone on August 27, 1941. However, plaintiff’s right to proceed as to the entire flooring item-was thereafter restored, and the final shipment of flooring was made on the Mary D. which sailed on October 7, 1941. On August 25,1941, plaintiff shipped 46.1,009 feet board measure *140 of terminated items of lumber, marked for this contract, on the James Griffiths, and on September 25 shipped 1,246,814 feet board measure of lumber similarly marked on the third voyage of the Lahe Frames. The lumber contained in these shipments was neither tendered nor delivered to The Panama Canal.
In the final settlement of the amounts due plaintiff under the contract in suit, The Panama Canal withheld $85,930.08 as the excess cost of the lumber repurchased from Dant & Russell, Inc. Also, demurrage charges in the amount of $7,977.09 which were incurred in the unloading of the Oregon and Idaho, and paid to Dant & Russell, Inc., were deducted from the amounts due plaintiff. The contract with Dant & Russell, Inc., contained a provision that upon delivery the lumber should be discharged at the rate of 500,000 feet board measure per running day, demurrage $1,500.00 per running day. In addition, the further sum of $2,985.03 was deducted as the actual loss incurred by The Panama Canal in cutting to size larger pieces of lumber then in stock to make from them smaller sizes which plaintiff had delayed in delivering.
On April 27,1942, plaintiff filed a claim with the contracting officer for the repayment of these withheld amounts. Plaintiff also included a claim for $18,967.99, representing increased ocean freight rates which plaintiff contended were payable under Paragraph 18 of the Purchase Conditions. These claims were denied by the contracting officer’s letter of May 16, 1942, which stated that the termination was proper because of plaintiff’s inability to give assurance that he would deliver available lumber, because of plaintiff’s inability to take advantage of the shipping space allocated by the Maritime Commission aboard the Oregon and Idaho, and because plaintiff had not furnished convincing evidence that the Conference ocean freight rates had been increased, as required by Paragraph 18 of the Purchase Conditions.
Plaintiff did not appeal to the head of the department from this decision, but instead filed a claim with the Comptroller General seeking recovery of the amounts withheld by the contracting officer and of the alleged increased ocean freight costs. On August 18, 1943, the General Accounting Office issued a Certificate of Settlement allowing plaintiff $718.59 *141 which represented two percent of the amount of the excess cost of the lumber purchased from Dant & Russell, Inc., and which would have been deductible by The Panama Canal if payment had been made within ten days after delivery of the lumber at Balboa.
Plaintiff now seeks to recover $35,211.49, representing the excess costs to defendant of completing the contract, $7,940.77 representing the demurrage charges paid to Dant & Russell, Inc., because of the delay in unloading the Oregon and Idaho, $2,985.03 representing the cost of cutting lumber to size, and $18,967.99 for increased ocean freight charges, or a total of $65,105.28. It is plaintiff’s contention that the defendant violated Article 5, the Delays-Damages clause, in terminating his right to proceed because his delays in performance were allegedly due to unforeseeable shortages of shipping space which were beyond the control and without the fault or negligence of plaintiff, and which were in part attributable to the acts of the Government in diverting vessels to war trade routes and in permitting unloading delays to occur at the Canal Zone ports;
Defendant insists that plaintiff has no standing to prosecute this action because following the adverse decision of the contracting officer (May 16,1942) on his claim, plaintiff did not appeal to the head of the department as required by Article'12, and thus failed to exhaust his administrative remedy.
The effect of the failure of a contractor, such as this plaintiff, to exhaust his administrative remedies has been before this court in recent cases. See Kilgore, et al. v. United States, 121 C. Cls. 340, John J. Harte Co. v. United States, 117 C. Cls. 309; Stafford v. United States, 109 C. Cls. 479. Our conclusion in these cases that the contractor cannot escape the consequences of the failure to appeal, as prescribed by the contract, has been based upon decisions of the Supreme Court to this effect. In United States v. Joseph A. Holpuch Co., 328 U. S. 234, 239, the Court set forth in the following language the rule which, in our opinion, disposes of plaintiff’s claim:
But Article 15 [Disputes' Clause] is something more than a dead letter to be revived , only at the convenience or discretion of . the contractor. It is a clear, unambig *142 ous provision applicable at all times and binding on all parties to the contract. No court is justified in disregarding its letter or spirit. * * * It creates a mechanism whereby adjustments may be made and errors corrected on an administrative level, thereby permitting the Government to mitigate-or avoid large damage claims that might otherwise be. created. United States v. Blair, 321 U. S. 730, 735. This mechanism, moreover, is exclusive in nature. Solely through its operation may claims be made and adjudicated as to matters arising under the contract. United States v. Blair, supra, 735; United States v. Callahan Walker Co., 317 U. S. 56, 61. And in the absence of some clear evidence that the appeal procedure is inadequate or unavailable, that procedure must' be pursued and exhausted before a contractor can be heard to complain in a court.
It follows that when a contractor chooses without due cause to ignore the provisions of Article 15 he destroys his right to sue' for damages in the Court of Claims. That court is then obliged to outlaw his claims, whatever may be their equity. - To do otherwise is to rewrite the contract.
Following the adverse decision of the contracting officer •upon his claim on May 16, 1942, plaintiff elected to present the claim to the Comptroller General, rather than to assert •his right under the Disputes clause by an appeal in writing to the head of the department. His failure to follow the remedy provided by the contract precludes plaintiff from presenting his claim to this court for decision on the merits thereof. ■
Plaintiff insists, however, that the contracting officer’s reply to his claim of April 27,1942, did not contain findings of fact and did not state legal conclusions, so.that there was .nothing from which plaintiff could appeal. Consequently, ¡plaintiff argues.that he-can come directly into court notwithstanding the contracting officer’s decision and without having ■exhausted his administrative remedy of appealing to the . head of the department concerned. It is true that the contracting officer’s letter of May 16, 1942, denying plaintiff’s -.claims was not entirely responsive to all of the detailed arguments set forth by plaintiff, but it did set forth the necessary ultimate facts upon which the contracting officer based his decision to terminate. Findings 26 and 35. See, also, finding 21. The contracting officer found that plaintiff could not •pbtain' lumber to utilize available shipping space, such as *143 that aboard the Oregon and Idaho, and that the plaintiff could not give assurance that he would deliver lumber which was available. Furthermore, the contracting officer found that plaintiff had not established that there had been any change in the Conference shipping rates which would justify the payment of increased freight costs under Paragraph 18 of the' Purchase Conditions. We conclude from the whole record that these findings were sufficient to give plaintiff an adequate basis upon which to take an appeal to the head of the department concerned.
Plaintiff has filed a number of exceptions to certain of the findings of the Commissioner of the court. Many of the exceptions are to the findings in their entirety. We have carefully considered these exceptions, and a thorough examination of the record has been made in connection therewith, as we did in the case of Schmoll v. United States, 105 C. Cls. 415, 456. On the basis of this examination certain additions and changes to some of the findings have been made, but on the Whole record we are satisfied that the facts as found by the Commissioner are substantially correct and set forth the .material facts pertinent to the claims presented by the plaintiff. :
In addition to the question of the finality of the findings and decision of the contracting officer, from which plaintiff did not appeal, both parties have presented detailed arguments on the merits of plaintiff’s claims. However, in view of our conclusion that plaintiff cannot maintain this case because of his failure to pursue and exhaust his administrative remedies as required by the contract, it is unnecessary to discuss and decide upon these arguments in detail. It is sufficient to say that these arguments on the merits have been considered in the light of the record, and, with the adjustment made by the Comptroller General, we think it cannot be said that the findings and decision of the contracting officer Were arbitrary or so grossly erroneous as to show bad faith.
The plaintiff is not entitled to recover and his petition is .dismissed. It is so ordered.
Howell, Judge; Madden, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.

 Article 12. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer, subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative,' whose decision shall be final and conclusive upon the parties hereto. In the meantime the contractor shall diligently proceed with performance.