Madden, Judge,
delivered the opinion of the court:
The plaintiff’s claim is based upon a misstatement by the Government, on a contract drawing, as to the level of the ground water at the site of a building which the plaintiff constructed for the Government. The drawing was one of, the papers submitted to prospective bidders for the contract, to enable them to compute their bids intelligently without feeling obliged to assume the possibility of adverse conditions which did not in fact exist, and raise their bids accordingly. The statement on the drawing was that the level of the ground water had been found at elevation —3 to —5 in ten test pits dug by the Government’s agents during December 1936 and January 1937. When the plaintiff, having obtained the contract, began to excavate in May, 1937, it found the water level at elevation +4.5, or from seven to nine feet higher than the test pit drawing stated. It cost the plaintiff $3,936.06 more to do the work than it would have cost if the water level had been as stated on the drawing, and this suit is for that amount.
The Government offers no explanation of the misstatement. When the plaintiff discovered the actual level of the ground water and said that it expected to be paid its extra costs of coping with it, the Government’s reply was that the drawing disclosed the ground water level as of December, 1936, and January, 1937, and that the level varied with the seasons. The plaintiff’s evidence shows that there was no substantial variation from the end of May to the middle *530 of September. The Government offered no evidence at all to the effect that the discrepancy could be accounted for by seasonal variation. In that condition of the evidence we have concluded that there was no substantial seasonal variation in the water level, and that the statement on the drawing was wrong both as of the time the excavation was made, and as of the dates given on the drawing itself.
The Government says that it is immune from liability because of the following language in the standard instructions to bidders, which had been sent to the plaintiff:
Bidders must make their own estimates of the facilities and difficulties attending the execution of the proposed contract, including local conditions, uncertainty of weather, and all other contingencies.
This language does not require bidders to presume the possible falsity of information such as that given on the water level drawing, for the purpose of inducing bids carefully adjusted to the stated conditions. See United States v. Atlantic Dredging Co., 253 U. S. 1, 10.
The Government says that certain statements in the specifications were inconsistent with the statement on the drawings about the ground water level, and that the specifications provided:
In case of difference between drawings and specifications, the specifications shall govern.
The inconsistent statements in the specifications relied on by the Government are (1) that excavations should be kept free of water during the placing of concrete, and (2) that the wooden portion of composite piles should be cut off at elevation —3.25. As to (1) it is urged that if the water level had been at —3 to — 5, as the drawing stated, there would have been no point in the requirement that excavations should be kept free of water since there would have been no water at the level of any of the excavation. .This contention is not sound, for regardless of the level of the ground water, heavy rains while excavations are open always cause an accumulation of water which should be pumped out before concrete is poured. As to (2) the language of the specifications was:
*531 The’ top of the tenon on the wood section in place shall not be above elevation —3.25, referred to mean low-water at the site, when the pile has been driven to required bearing.
Piles driven to —3.25 would have been submerged, if the water level had been at —3. The drawing said it was at —3 to —5. Since the specifications said that the tops of the piles “shall not be above” -3.25, and since the custom of the trade required that they be submerged, the contractor could well have been expected to drive them the small distance beyond —3.25 which would have submerged them if the water level had been at —5, the lowest level stated on the drawing. We therefore find no such difference between the drawing and the specifications as to require the drawing to be discarded from the contract.
The Government points to the fact that a drawing showing the detail of the subbasement contained a prohibition against the development of hydrostatic pressure, and that there could have been no hydrostatic pressure if the statement on the other drawing about the water level had been true. It says this should have warned the plaintiff that the statement was not true. But the excavation for the subbasement was to go to —2, and in one corner to —2.75. This was so near to the —3 of the water level drawing that the prohibition against hydrostatic pressure was not, by any means, obviously unnecessary. Even if there was a discrepancy which due care would have discovered, the plaintiff is not disabled from recovering, for reasons stated hereinafter.
The Government relies on Article 12, page 1 G-4 of the specifications, which provides in part:
In any case of discrepancy in the figures, drawings, or specifications, the matter shall be immediately submitted to the contracting officer, without whose decision such discrepancy shall not be adjusted by the contractor, save only at his own risk and expense.
We think that this article has nothing to do with our problem. Fairly interpreted, it contemplates a situation where the contract papers in one place seem to direct that one thing be done, and in another place another. A choice has *532 to be made, and the contracting officer, not the contractor, is given the choice. This plaintiff faced no such problem. It encountered water some seven to nine feet higher than it anticipated, and it had to get rid of the water before it could build the building. There was no choice to be made. If the plaintiff had adopted an unduly expensive method of getting rid of the water, it could not recover the excess cost which its method entailed. The Government’s construction engineer in charge was notified immediately when the problem arose, and a cheaper method of removing the water, by a sump pump, was, to his knowledge, tried without success. He had no further suggestion, and the plaintiff then installed the wellpoint system, which worked. The Government lost nothing by reason of the plaintiff’s handling of the problem. .
The most meritorious contention which the Government makes is that, as we have found, a construction engineer in excavating as near to tidal water as this site was known to be would have reasonably expected to encounter ground water at an elevation above rather than below mean low water. We have, then, a situation in which the Government, apparently negligently, since no explanation is offered, and there is no reason to suppose intentional misrepresentation, misstated a material fact and thereby misled the plaintiff, to its damage. But the plaintiff was negligent in not discovering the misstatement and ascertaining for itself what the facts were before it submitted its bid. If the Government’s representation had been intentionally false, the plaintiff’s negligence in relying on it would not, in the other circumstances here present have prejudiced the plaintiff’s position. It not being intentionally false, but both parties being negligent, we think their position is that of persons who have made a mutual mistake as to a material fact relating to the contract. We should, therefore, in effect reform the contract by putting them as nearly as possible in the position they would have occupied but for the mistake.
As we have said, the plaintiff was misled by the misstatement. It included in its computation of its bid only *533 a small sum for dealing with surface water such as would have been likely if the statement on the drawing had been true. It is fairly inferable that its bid would have been increased by substantially the amount of its increased cost, plus overhead and profit, if it had not been misled. As to what the Government’s position would then have been, it is impossible to determine. Whether there were other bids; if so, how they compared with the plaintiff’s bid; whether other bidders were misled as the plaintiff was, we do not know. If these facts would, have been material, which we do not determine, it was the Government’s duty to bring them forward, since it committed the first fault which produced the difficulty. We must assume, then, that the Government received the benefit of the plaintiff’s additional expenditure which, we have found, was worth what it cost. It is not inequitable, then, to require the Government to pay for what it got. We include nothing for overhead and profit. We have not discussed the possible applicability of Article 4 of the contract, relating to “changed conditions,” as the Government has taken the position that there were no conditions encountered differing from those indicated in the contract papers, if those papers had been properly read. With that attitude, the Government would not, as it did not, make any adjustment under Article 4, and cannot fairly claim that the plaintiff’s position is prejudiced because it did not succeed in obtaining relief under that article.
The plaintiff may recover $3,936.06.
It is so ordered.
Whitaker, Judge; and Whaley, Chief Justice, concur.