## McNAMARA CONSTRUCTION OF MANITOBA, LTD.

v.

### The UNITED STATES.

No. 417–73.

United States Court of Claims.

Jan. 22, 1975.

James H. Mann, Washington, D. C., for plaintiff. Robert E. Kline, Jr., Washington, D. C., atty. of record, for plaintiff.

Bernard M. Brodsky, Buffalo, N. Y., with whom was Asst. Atty. Gen. Carla A. Hills, for defendant.

Before COWEN, Chief Judge, and SKELTON and BENNETT, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge.

By fixed-price contract dated June 30, 1964, plaintiff McNamara Construction of Manitoba, Ltd. (hereinafter McNamara) undertook to construct for the Army Corps of Engineers a canal lock and related structures (New Second Lock) at St. Mary's Falls Canal, Sault Ste. Marie, Michigan.[1] The original completion date of June 30, 1967, was extended by a series of modifications to October 19, 1968. The work was completed and accepted as of that latter date and the administrative claims under the contract have been settled.

This claim arises out of unusually severe labor problems—strikes, delays, and harassment—which plagued McNamara throughout the performance of the contract and which resulted in additional labor (and labor-related) costs. The contracting officer freely granted plaintiff extensions of time for the delays resulting from those labor problems because the delays were not McNamara's fault, but disclaimed any authority or obligation to make a financial adjustment.[2] Plaintiff's subsequent request to the Secretary of the Army for special, discretionary statutory relief pursuant to Public Law 85–804, 72 Stat. 972 (1958), 50 U.S.C. § 1431 et seq., was denied.

Plaintiff now seeks to recover those additional labor costs[3] in this court on a theory of reformation of contract due to an alleged mutual mistake of fact. The mutual mistake of fact, states plaintiff, was that "neither the contractor nor the [Engineering] Corps was aware of or could possibly have anticipated the unreasonable and uncooperative attitude and conduct of the labor unions." Plaintiff says both parties assumed labor would behave in a responsible fashion but they were mistaken in that assumption. As proof of the alleged mutual mistake, plaintiff notes that the Government's estimate of the cost of the project, $22,189,692, was roughly equivalent to plaintiff's bid of $21,471,690; yet, after accounting for modifications, the unanticipated labor costs swelled the ultimate cost of the project allegedly in excess of $6 million above those figures.

■ Plaintiff's claim must fail. There was, simply, no mutual mistake of fact by the parties of the type for which judicial relief may be given. Both parties, at the time of executing the contract,

---

1. The contract is designated DA 620–064, CIVENG 64–140. Plaintiff was the low bidder.

2. The contracting officer's position that neither he nor any contract appeals board has jurisdiction to consider plaintiff's claim for additional labor costs is undisputed by the parties.

3. The additional cost of labor is asserted to be $6,312,817.21.

were fully aware of the potential for labor difficulties. This awareness is reflected in clause 5 of the contract, which states in relevant part:

#### 5. TERMINATION FOR DEFAULT—DAMAGES FOR DELAY—TIME EXTENSIONS

\*  \*  \*  \*  \*  \*

(d) The Contractor's right to proceed shall not be so terminated nor the Contractor charged with resulting damage if:

(1) The delay in the completion of the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor, including \* \* \* strikes \* \* \*.

█ Even were the above provision not in the contract, we could take judicial notice of the risk of strikes and other labor problems inherent in the vast majority of construction contracts. This is a fact of modern commercial life. Neither the contractor nor the Government could be presumed ignorant of this risk. Defendant denies that it ever entered into the contract upon the assumption of labor peace and says that this was just plaintiff's unilateral assumption.

What we have in the instant case, therefore, is a risk which is known to both parties and results from human inability to predict the future. The authorities are unanimous in distinguishing such risks from bona fide mutual mistakes of fact. In 13 Williston, Contracts § 1543 (3d ed. 1970) at 75, it is said:

\* \* \* there must be excluded from consideration mistakes as to matters which the contracting parties had in mind as possibilities and as to the existence of which they took the risk. \* \* \*.

A similar statement is made in 3 Corbin, Contracts § 598 (2 ed. 1960) at 585–86:

\* \* \* The same result obtains in any case where the risk of the existence of some factor or of the occurrence of an event is consciously considered in agreeing upon terms. There is no mistake; instead, there is awareness of the uncertainty, a conscious ignorance of the future. \* \* \*.

The Restatement, Contracts § 502, comment *f*, reinforces the distinction:

Where the parties know that there is doubt in regard to a certain matter and contract on that assumption, the contract is not rendered voidable because one is disappointed in the hope that the facts accord with his wishes. The risk of the existence of the doubtful fact is then assumed as one of the elements of the bargain.

*See also* Leasco Corp. v. Taussig, 473 F.2d 777 (2d Cir. 1972).

Plaintiff argues, however, that while both parties may have been aware of the risk of a "normal" strike, neither party anticipated the severe labor difficulties which eventuated. This attempted distinction based on the degree of the difficulties encountered is fallacious. First, there is no evidence whatsoever that defendant ever thought in terms of a "normal" as opposed to a "severe" strike. Secondly, the distinction is unworkable as a practical matter, because there is no such recognizable concept as a "normal" strike, and no clear line between "normal" and "severe" difficulties. Furthermore, it is unlikely that the parties to a contract of this type ever *plan* for the most unfavorable outcome, even though they are aware of the risk of such an outcome.[4]

█ In those circumstances, not present here, in which we are able to identify a mutual mistake of fact, we

---

4. Compare Restatement, Contracts § 502, illustration 8, at p. 965:

"8. A contracts with B to dig a trench in a stated place. Owing to frozen ground A cannot make a thorough examination of the character of the soil. The fact that the soil is

such as to make excavation materially *more difficult than either A or B supposes* does not make the contract voidable, if the parties did not base their contract on any particular condition of the soil." [Emphasis supplied.]

still cannot grant reformation if the contract puts the risk of the mistake upon the party asking reformation. National Presto Industries, Inc. v. United States, 338 F.2d 99, 108, 167 Ct.Cl. 749, 764 (1964), cert. denied, 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965). In the instant case, the risk of labor strife was placed, both explicitly and implicitly by the contract, on McNamara.

Clause 13 of the contract places responsibility on the contractor to take steps "reasonably necessary to ascertain the nature and location of the work, and the general and local conditions which can affect the work or the cost thereof. Any failure by the Contractor to do so will not relieve him from responsibility for successfully performing the work without additional expense to the Government." Plaintiff assures the court, and we see no reason to doubt the fact, that plaintiff visited the site prior to bidding, and investigated as best it could the availability and cost of labor in the area. Plaintiff's effort to comply with clause 13 does not, however, alter the clear implication of the clause that the risk that local conditions will turn out to be other than plaintiff expected falls on plaintiff. We have previously held, for example, that the presence of such a clause in a contract placed the risk of a mistake as to subsurface materials on the contractor. Flippin Materials Co. v. United States, 312 F.2d 408, 160 Ct.Cl. 357 (1963). In *Flippin* the contractor did not make an adequate on-site investigation but did argue for reformation. In stating principles useful to us in resolving the instant case, the court said:

> * * * a mutual mistake as to a fact or factor, even a material one, will not support relief if the contract puts the risk of such a mistake on the party asking reformation (United States v. Hathaway, 242 F.2d 897 (C.A.9, 1957) ), or normally if the other party, though made aware of the correct facts, would not have agreed at the outset to the change now sought * * *. [312 F.2d at 415, 160 Ct.Cl. at 368.]

Continuing, the court stated further:

> * * * The elaborate contract provisions on "Site Investigation and Representations", [footnote omitted] together with the omission of the usual changed conditions clause, show that the risks of mistakes as to subsurface materials were deliberately placed on the plaintiff; in the absence of misrepresentation, the contractor was to be bound by what he met during performance. * * *. [312 F.2d at 415–416, 160 Ct.Cl. at 368–369.]

Plaintiff McNamara does not claim any misrepresentation by defendant, only mutual ignorance. But, the site investigation (disclaimer) clauses in the two cases are similar in indicating that the contractor carries the risk of mistake arising from his investigation of "general and local conditions which can affect the work or the cost thereof."

Also in *Flippin*, there was labor trouble for which the parties were not to blame. The court held this gave plaintiff no right to recover the losses arising therefrom for such recovery would be "an unauthorized gratuity without consideration." 312 F.2d at 417, 160 Ct.Cl. at 371.

The fact that McNamara's contract provided for extensions of time in the event of delay due to strikes and other clauses (clause 5(d)(2) ), but not for compensation of costs arising out of strikes, is also significant in light of traditional allocation of risks in a fixed-price contract. The rule is succinctly stated in United States v. Spearin, 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918):

> * * * Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered. * * *.

We have consistently held that the contractor in a fixed-price contract assumes the risk of unexpected costs. Sperry Rand Corp. v. United States, 475 F.2d 1168, 1175–1176, 201 Ct.Cl. 169, 181 (1973); Aerojet-General Corp. v. United

States, 467 F.2d 1293, 1300–1301, 199 Ct.Cl. 422, 434 (1972); Rolin v. United States, 160 F.Supp. 264, 268–269, 142 Ct.Cl. 73, 82 (1958). *See also* 3 Corbin, Contracts § 598 (2d ed. 1960) at 590. In firm fixed-price contracts, risks fall on the contractor, and the contractor takes account of this through his prices. Nash, Risk Allocation in Government Contracts, 34 Geo.Wash.L.Rev. 693, 694–96, 701–02 (1966).

A labor strike, beyond the control of either party, may be analogized to an act of God. In Tombigbee Constructors v. United States, 420 F.2d 1037, 190 Ct.Cl. 615 (1970), the flooding of a borrow pit from which the contractor was to obtain dirt delayed work and raised costs. We found that neither party had made rain, or the lack of it, a basis of the bargain, and that the contract was silent as to the allocation of the loss. The burden of this act of God, therefore, was left on the contractor, for there was no basis for shifting the loss to defendant. Only an extension of time was available for relief. 420 F.2d at 1043, 190 Ct.Cl. at 627. In light of clauses 5 and 13 in the McNamara contract, there is even less basis for shifting McNamara's loss to the Government. *See also* Day v. United States, 245 U.S. 159, 38 S.Ct. 57, 62 L.Ed. 219 (1917); Amino Bros. Co. v. United States, 372 F.2d 485, 178 Ct.Cl. 515, cert. denied, 389 U.S. 846, 88 S.Ct. 98, 19 L.Ed.2d 112 (1967), Arundel Corp. v. United States, 103 Ct.Cl. 688, cert. denied, 326 U.S. 752, 66 S.Ct. 90, 90 L.Ed. 451 (1945).

Plaintiff relies heavily on our *National Presto* decision, *supra*. *National Presto* is distinguishable from the instant case, however, on every count. In that case the contractor had agreed to produce 105-mm. shells by a new experimental method. Prior to contract, the parties had mutually agreed after discussion that the shells could be produced without the use of turning equipment. This belief proved incorrect. We held that the unanticipated need for turning equipment was a mutual mistake of fact. We also held that plaintiff should not assume the entire risk, because the parties

were engaged in a "joint enterprise" in which the Government was just as interested in the "perfection of the new process" as in the end product. 338 F.2d at 108–109, 167 Ct.Cl. at 764. We further noted that because of the Government's interest in perfecting the process, it received a direct benefit from the costs expended in determining that turning machines were required. Finally, we noted that "[s]ince the Government was to pay for the machines, [footnote omitted] in the area of equipment the agreement was at least as close to a cost contract as to a fixed-price one." 338 F.2d at 109, 167 Ct.Cl. at 765. Based on the peculiar facts of the case, we awarded the contractor one-half of the unanticipated cost.

In cases subsequent to *National Presto* we have made it very clear that the result in that case was reached on the unique facts there presented. *See*, for example, Sperry Rand Corp. v. United States, *supra*; Olin Mathieson Chem. Corp. v. United States, 179 Ct.Cl. 368, 408 (1967); and Natus Corp. v. United States, 371 F.2d 450, 178 Ct.Cl. 1 (1967). In the instant case we have seen that there was no mutual mistake of fact as to the risk of labor difficulties. There was, moreover, no "joint enterprise" and no experimental value to the Government in the process used to build the New Second Lock. The Government received no benefit from the additional costs of the labor strikes and expressed no willingness to assume such costs. Nor can such willingness be fairly inferred, as in *National Presto*. McNamara's contract was a fixed-price agreement to build a lock, and defendant got only what it contracted for in that contract. The risks were assigned to plaintiff by the contract.

Other cases cited by plaintiff are inapposite. In Poirier & McLane Corp. v. United States, 120 F.Supp. 209, 128 Ct.Cl. 117 (1954), both the Government and the contractor intended the payment to labor of "the prevailing wage rate," which the parties believed was 85 cents. This rate was thus stated in the con-

tract. In fact, however, the prevailing rate was $1 per hour, and since the court found that both parties intended that the contract should contain the actual rate, we reformed the contract to reflect such intent. *Accord,* Southwest Welding & Mfg. Co. v. United States, 373 F.2d 982, 179 Ct.Cl. 39 (1967); Stafford v. United States, 74 F.Supp. 155, 159–160, 109 Ct.Cl. 479, 507 (1947). In the McNamara contract, however, the Government's only intent was to pay the fixed price set by the contract. *Cf.* Evans Reamer & Machine Co. v. United States, 386 F.2d 873, 880–881, 181 Ct.Cl. 539, 552 (1967), cert. denied, 390 U.S. 982, 88 S.Ct. 1102, 19 L.Ed.2d 1279 (1968). No assumption of labor harmony was made a basis of the bargain, there was no understanding or commitment by defendant to pay "the prevailing wage rate" or actual labor costs, and defendant had no duty to warn this experienced contractor to beware of potential labor difficulties other than as suggested by clauses 5 and 13. For reformation we would need some antecedent expressions by the parties at variance with the terms of the contract or some articulated mutual assumption regarding labor behavior which we could incorporate into the agreement or some indication that a mutual mistake existed as to a hard fact on which the parties had based the contract. A mistake on the part of one contracting party will not provide the basis for reformation, particularly where it is based on an unwarranted assumption of the party who should have known better on the basis of its experience. Olin Mathieson Chem. Corp. v. United States, *supra.* Reformation based on such assumption or on inference arising from the contract price would render fixed-price contracts meaningless and throw the procurement process into chaos.

Plaintiff reminds us of our statement in Peter Kiewit Sons' Co. v. United States, 74 F.Supp. 165, 168, 109 Ct.Cl. 517, 523 (1947), that a contract with the Government should not be a "gambling transaction." Plaintiff is mistaken, though, if it would interpret this statement as a repudiation of the concept of entrepreneurial risk. In *Peter Kiewit,* the contractor was required to bid a unit price per cubic yard for borrow excavation, based on estimates of the amount of excavation necessary to permit the construction of airfield runways at a certain grade. After work had begun, the Government changed the finished grade for borrow excavation, thereby reducing significantly the amount of excavation to be done. Though the reduced quantity of excavation raised the contractor's unit cost, the Government refused to accede to a change in contract terms on the ground that the contract's "quantities" clause had alerted the contractor that ultimate quantities might be more or less than the estimates. We held in favor of the contractor, stating that the contractor properly believed that the estimates would prove approximately correct. It can be seen from the above recitation of facts that, unlike the labor costs incurred by McNamara, the increased unit costs in *Peter Kiewit* were the result of the Government's changing a key assumption of the contract. The Government's estimates and the contractor's planning were based on a particular grade of excavation. When the Government changed the grade, it changed the basis of the bargain. In contrast, an absence of labor strife was not the basis of McNamara's bargain. Williston cites our *Flippin Materials* and *National Presto* cases as authority for the rule that "[w]ith respect to any matter not made a basic assumption of the contract, the parties take their chances." 13 Williston, Contracts § 1543 (3d ed. 1970) at 75. The contract here cannot be reformed to reflect such expression and intent as plaintiff asserts. We simply do not have a mutual mistake. On the contrary, as pointed out above, clauses 5 and 13 of the contract refute it by showing that labor trouble was anticipated, considered, and resolved by those clauses. That is the mutual intent and basic assumption that the parties here did express and it governs the case. It is true that neither party to the contract was to blame for the illegal, unreasonable labor trouble and misbehavior that increased

plaintiff's costs. But, that does not justify a shift of such costs to defendant unless defendant had agreed to accept them or, as *National Presto* teaches, "would have been willing, if it had known the true facts from the beginning, to bear a substantial part of the additional expenses." 338 F.2d at 112, 167 Ct.Cl. at 769. Here, it not only did not so agree but, in anticipation of difficulties, wrote the contract in such a way as to avoid their burden.

Virginia Eng. Co. v. United States, 101 Ct.Cl. 516 (1944), and Tobin Quarries, Inc. v. United States, 84 F.Supp. 1021, 114 Ct.Cl. 286 (1949), provide no support for plaintiff's claim. Both cases involved misrepresentation by the Government. There was no Government misrepresentation in the instant case.

In research and development contracts where costs are uncertain, the parties often agree to share those that cannot be foreseen. In fixed-price contracts, such as here where some risks are under control of third parties, if the Government intends to pay a part or all of the labor or material costs whatever they might be (otherwise the price might be much higher to cover the risk), such cost estimates frequently are not required to be included in bid estimates. Instead the contract incorporates an article for escalation adjustments in price according to an agreed formula reflecting labor or material cost increases during performance. This makes certain that the contractor will not lose a reasonable profit due to such contingencies. *Cf.* Bethlehem Steel Corp. v. United States, 423 F.2d 300, 191 Ct.Cl. 141 (1970). Defendant put no such clause in the contract here nor even a changed conditions clause for extra work. Absence of such negates belief that defendant intended at the outset to agree to the relief now sought or did not intend to put the risk of changed conditions on the contractor alone. This brings the problem within the *Flippin* rule where the contractor also tripped over both obstacles. Plaintiff would convert this fixed-price contract into a cost-plus contract and make the defendant an insurer upon the assumption that Congress wanted the project so badly that it would pay any price for it.

However sympathetic we may be to plaintiff's hardship, we can find no basis for plaintiff's recovery as a matter of law or in equity through contract reformation. We cannot assume that had it known these increased labor costs were inevitable Congress would have agreed to pay for them. We cannot base an award by judgment upon speculation or inference as to congressional attitudes. In Stafford v. United States, *supra*, and Flippin Materials Co. v. United States, *supra*, and in Ozark Dam Constructors v. United States, 288 F.2d 913, 153 Ct.Cl. 120 (1961), the court held that it could not grant an equitable adjustment to restore a contractor's losses due to labor troubles for which the parties to the contract were not to blame. There, as here, increased costs arising from labor troubles were not caused or desired by the contracting parties and neither could have prevented the same.

Defendant's motion for summary judgment is granted. Plaintiff's cross-motion for summary judgment is denied. The petition is dismissed.

SKELTON, Judge (dissenting):

I respectfully dissent, because I believe that if justice is to be done in this case the court should use its equitable powers and reform the contract because of mutual mistake of material existing fact. It is not fair, right, nor just to require the contractor to bear the huge loss incurred in the performance of the contract when such loss was not the result of any negligence, fault, or lack of responsibility on the part of the contractor, nor of the government, but was the result of mutual mistake of fact by the parties when they entered into the contract, as shown below.

In my opinion there was a mutual mistake of fact by the contractor and the government in three areas, all of which are related as follows:

1. The parties entered into the contract under the assumption and belief

that in its performance the contractor would have the use of labor that would act responsibly and that he would have no more than normal labor difficulties.

2. In agreeing on a fixed price in the contract, the parties included an amount that the contractor would have to pay in performing the contract for responsible labor based on prevailing rates in the area.

3. The parties agreed on the length of time it would take to complete the project and fixed June 30, 1967, as the completion date. This agreement was based on their belief that the contractor would have the use of responsible labor who would not unduly delay the project, and that he would have no more than normal labor difficulties.

The mutual mistake of fact in these three areas will now be discussed in the order listed above.

I

*The Irresponsible Conduct of Labor and the Abnormal Labor Difficulties*

The irresponsible conduct and outrageous misbehavior of labor in this case shocks one's sense of justice. The constant harassment of the contractor by the members of the labor unions and by the unions themselves, their unreasonable demands and threats, and their disruptive, arbitrary, and capricious acts throughout the performance of the contract created an impossible and incredible situation that was nothing short of an outrage. Their demands and threat at times were little short of hooliganism, and their disruptive and damaging conduct indicated they were bent on mischief and sabotage if their unreasonable demands were not met.

It is impossible to adequately describe in a few words the specific disruptive and irresponsible acts of labor in this case. However, it appears to be necessary to show these acts in detail so that this phase of the case may be properly presented. The plaintiff has described them in vivid detail in its petition where it is alleged in pertinent part as quoted below:

"10. No other labor was obtainable in this remote corner of northern Michigan when the contractor sought to replace workmen fired for cause, such as playing cards on the job, striking a supervisor, or just plain loafing. Accordingly, in order to avoid or shorten work stoppages, plaintiff had no alternative but to rehire workmen fired for cause when their rehiring was demanded by the labor unions. It was impossible to deal with the irresponsible attitudes of the local labor unions in this remote tight labor market, and the local unions were not properly or adequately guided by their regional supervisors.

"11. Many labor difficulties arose from jurisdictional disputes between the various trade unions concerning which should handle various types of work. The Contracting Officer used his best efforts to prevent work stoppages and to hold the time lost to a minimum, but his efforts were fruitless. Consequently, the contractor remained helpless, and had no alternative but to yield to unreasonable labor demands in order to get work going again. The contractor was at fault in no way in these disputes between trade unions as to who should do the work. He could only try to help them adjust their differences, and to await the trades settling their disputes between themselves, or hire dual crews to perform the work contested in these jurisdictional controversies. All the labor unions represented in work on this contract engaged in jurisdictional disputes, including strikes and other work stoppages. The Operating Engineers, the Carpenters, and the Laborers Unions were particularly contentious, but the Plumbers, the Pipe Fitters, the Ironworkers, the Electricians, the Cement Workers, the Painters, the Teamsters, the Millwrights, the Asbestos workers and the Marine Workers Unions were also involved in a number of jurisdictional disputes resulting in work stoppages or the use of dual crews. When a picket line was established by one union, none

would cross it. Even when there was no picket line, a work stoppage by one of the trades affected all of them.

"12. The Operating Engineers Union was repeatedly engaged in jurisdictional disputes with the Laborers Union, as well as with other unions, with the result that there were long work stoppages in each case which delayed performance and greatly increased the costs of performing the contract. As an example, only four months after contract performance had begun the preceding July, there was a jurisdictional dispute between the Operating Engineers and the Laborers Unions with a work stoppage of 10 days (November 7–17, 1964) regarding who should operate air-trac drills modified to work on rails. It was finally agreed that the Laborers would operate all air-trac drills on rails. However, the Operating Engineers took advantage of this same work stoppage (1) to insist that they be permitted to hire any additional personnel needed in this work; (2) to insist that their Chief Master Mechanic be responsible for the assignment of all workmen engaged in supervision of maintenance and repair work; and (3) to protest the lay-off of 17 men temporarily not needed. They only returned to work when two members of their union were rehired. This 10 day work stoppage affected all trades, as they refused to work while it continued.

"13. In December 1964, there were two jurisdictional disputes, one lasting two days between the Pipefitters and the Operating Engineers Unions, and the other lasting 10 days between the Operating Engineers and the Laborers Unions, over the operation of the core drilling equipment. It was finally decided that the Operating Engineers would operate all core drills, and it was reiterated that the Laborers would operate all trac drills. This was followed by another jurisdictional dispute in January 1965 between the same two unions, causing a five day work stoppage (January 25–30, 1965) over who should operate and service air-trac drills not mounted on rails. It was agreed that the Laborers would

operate the drills, but the Operating Engineers would maintain and move them.

"14. There was a jurisdictional dispute between the Operating Engineers and the Carpenters Unions resulting in a work stoppage lasting 16 days (August 13–29, 1965) over who would be responsible for drilling timber fender angles. It was finally agreed that the Carpenters would operate the drill presses in this work.

"15. An oiler was discharged for striking one of the plaintiff's supervisors. This resulted in a 12 day work stoppage (April 29–May 11, 1966) until the matter was submitted to arbitration. After arbitration, it was held that such conduct was not to be condoned, but the workman was permitted to return to work without back pay.

"16. In June 1966, there was a jurisdictional dispute between the Ironworkers and the Carpenters Unions over which should do the welding on the parapet curb angles. The Ironworkers claimed jurisdiction on work that had been assigned to the Carpenters in 1965. A picket line was established, which all unions refused to cross. The matter was referred to the National Joint Board, which ordered the picket line removed, since there was no basis for changing the original assignment to the Carpenters. Nevertheless, this jurisdictional dispute resulted in an intermittent work stoppage totalling 10 days between June 10 and July 28, 1966.

"17. In March 1965, a laborer was dismissed for playing cards on the job during working hours. The Laborers Union struck and established a picket line, which was only removed after an agreement that the man be permitted to return to work. There was, however, a work stoppage of five days (March 20–25, 1965).

"18. There was a series of some 60 work stoppages when members of the Carpenters Union refused to work in the rain, even though the rain was just a drizzle and notwithstanding that other work was available for them in sheltered

areas. In these instances, other trades continued to work. However, these unjustified work stoppages by the Carpenters caused a great increase in cost, since the time lost by failure to work had to be made up in large measure on an overtime basis.

"19. Due to the obstructionistic attitude of the Operating Engineers, the contractor was forced to cancel its work program for the winter of 1966–1967, although there was work that could have been done.

"20. In May 1967, there was a jurisdictional dispute between the Ironworkers and the Millwrights Union over the alignment of wall groins prior to gate erection. The Ironworkers staged a wildcat walkout, and the question was referred to the International Unions. In the interval, however, since the contractor was helpless in this jurisdictional dispute, dual crews were employed to maintain peace between the two unions. The Ironworkers returned to work, but two work days were lost.

"21. In July 1967, there was a jurisdictional dispute between the Carpenters and the Laborers Unions regarding the handling of forming materials following their final usage, which resulted in a work stoppage of two days. To get the work going again, it was necessary to make a financial settlement with the Carpenters, even though the work continued to be done by the Laborers.

"22. In March 1968, there was a 13 day work stoppage due to a jurisdictional dispute between the Plumbers and the Pipefitters Unions with regard to the employment of a working foreman. The foreman was changed to a nonworking category.

"23. In May 1968, the Laborers Union struck and established a picket line, which was respected by all Unions, because of its illegal insistence upon a new contract even though the old contract under which they worked had not yet expired. The Union's demands were finally accepted, but not until after a 54 day work stoppage.

"24. In June 1968, the Masons Union refused to report for work until a new wage agreement was accepted, although the current agreement was still in effect. McNamara sought a court injunction. An out-of-court financial settlement was finally reached, but not until after a 16 day loss of time.

"25. In August 1968, members of the Asbestos Workers Union went on strike while a new agreement was under negotiation, resulting in a work stoppage of 46 days.

\* \* \* \* \* \*

"27. These several trade unions continually harassed the plaintiff by refusing to work, calling wildcat strikes, and setting up picket lines which members of the other unions refused to cross, even when the strikers' complaints were without justification or merit.

"28. In addition, the contractor's losses were increased because of unjustified featherbedding practices which, like the jurisdictional disputes, plaintiff was helpless to correct. There were threats of work stoppage to prevent automation. There were many instances where another worker, upon the insistence of the Operating Engineers Union, was required to attend each pump, compressor, and the like, when, in fact, one worker could have attended several. Many trade unions insisted upon having standby workers when another trade was engaged in the actual work, such as in cases of moving machinery on the island and the use of a portable welding machine used by other than the Operating Engineers. The Teamsters and Operating Engineers insisted upon at least one teamster or operator being with a truck or other piece of equipment while it was being moved over the water from one part of the island to another, even though the particular equipment had not been used prior to the move and was not going to be used immediately thereafter. The Marine Unions refused to work overtime, and it was impossible to get members of other trades off the island at the end of their shifts without engag-

ing the Marine workers for an additional shift."

The government does not deny nor contest these allegations and in effect has agreed that they are true. The contracting officer on the job recognized the agonizing and abnormal labor situation that confronted the contractor and unhesitatingly granted numerous time extensions because of it. After the completion of the contract, the contractor applied to the Army Contract Adjustment Board for extraordinary contractual adjustment under Public Law 85–804. The Board in denying discretionary relief found significantly that as a result of labor problems "the contractor experienced 85 separate periods of work stoppages totaling 303 days." The Board also found that the contractor "did encounter more labor difficulties than normal." This finding is indeed a mild description of the actual labor situation on the job. As will be more specifically pointed out later, the contractor began work in July 1964, with a contract completion date of June 30, 1967, which allowed about three years to complete the project. The work stoppages of 303 days as found by the Board shows that during approximately one-third of the contract period, work on the project was idle because of labor difficulties. This meant that during one out of every three days, approximately, no work was done because of the irresponsible acts of labor.

In view of the foregoing, no one can argue that the contractor performed the contract under normal labor conditions. Neither can it be contended that the contract was performed with normal labor difficulties. While it may be somewhat difficult in an ordinary run-of-the-mill case to determine what are "normal labor conditions" or what constitutes "normal labor difficulties," we have no problem with such determinations in this case. The overwhelming evidence shows without question the abnormal labor difficulties the contractor encountered, and the government admits this is true.

Prior to the execution of the contract there was nothing to put the contractor or the government on notice or even on inquiry that irresponsible labor conduct or more than normal labor difficulties would be encountered by the contractor. Consequently, the parties entered into the contract believing that the contractor would have the use of labor that would act responsibly and that he would have no more than normal labor difficulties. As can be seen from the foregoing facts, this was a mutual mistake of material fact for which neither party was responsible.

## II

*The Amount Included in the Contract for the Cost of Responsible Labor Based on Prevailing Rates in the Area*

Before the execution of the contract, the contractor made a thorough and painstaking investigation as to the availability of labor and the prevailing rates for such labor in the area of the project. Based on the information thus obtained, the contractor estimated that responsible labor would cost $6,162,066 and included that amount for labor in its bid of $21,471,690 for the project. The contract was awarded to the contractor for this amount. The government had estimated the total cost would be $22,189,692, in which amount the estimated cost of labor was included. However, the record does not show the amount of the government's estimate for labor. Nevertheless, government counsel admitted in oral argument that the estimate of the government for labor costs was far below the amount the contractor was required to pay, which amount is set forth below. Actually, as will be demonstrated, the government's estimate for the cost of labor was not much different to that of the contractor. This conclusion is arrived at in the following manner. The plaintiff was awarded the contract for a fixed price of $21,471,690 and during the performance of the contract various change orders increased the contract price to $23,347,638.48, an increase of $1,875,948.48. As pointed out above, the government had estimated the total cost

would be $22,189,692. By adding the increase of $1,875,948.48 by reason of the change orders, the government's estimate would be the sum of $24,065,640.48 in comparison with the final contract price to be paid to the plaintiff in the sum of $23,347,638.48. However, the total cost to the plaintiff was $29,660,455, which included $14,222,624 for labor instead of $6,162,066 that the plaintiff had estimated, resulting in a difference of $8,060,558.

By subtracting the government's estimate plus the increase caused by the change orders, all in the total sum of $24,065,640.48 from the total cost of the project in the sum of $29,660,455, we see that the government's estimate was $5,594,814.52 less than the total cost of the job. The plaintiff says it lost $6,312,817.21 on the job and that this was caused by the irresponsible conduct of labor described above. While, as stated above, we do not know the exact estimate of the government for labor, it would appear that it was not far different from that of the plaintiff, because the difference between the government's original estimate in the sum of $22,189,-692 was only $718,002 more than the plaintiff's bid of $21,471,690 in which the plaintiff had estimated labor would cost $6,162.066. Furthermore, the government's original estimate plus the increase by the change orders, all in the total sum of $24,065,640.48 was $5,594,-814.52 less than the total cost of the job in the sum of $29,660,455, which was only $718,002.69 less than plaintiff lost on the job. (Plaintiff's loss of $6,312,-817.21 less $5,594,814.52 equals $718,-002.69.)

These figures show that the amount included in the contract for labor costs was based on almost identical estimates by both the contractor and the government. It appears clear that both parties agreed in effect that the plaintiff's bid of $21,471,690 in which was included $6,162,066 for labor was in line with the estimates of both parties, and that the estimated cost of labor was realistic and was based on the reasonable cost of responsible labor in the area of the project.

The parties entered into the contract on this basis in good faith. However, as shown above, instead of labor costing $6,162,066, it cost $14,222,624, because of the irresponsible and outrageous misbehavior of labor as previously pointed out, which could not be anticipated by the parties. Consequently, the contractor and the government entered into the contract under a mutual mistake of material fact as to the cost of labor.

### III

### *The Agreement in the Contract as to the Time Required to Complete the Project*

Work was started on the project by the contractor in July 1964. The parties agreed that the completion date would be June 30, 1967. This agreement as to the length of time that would be required to complete the project was based on the considered judgment of the parties that with the cooperation of responsible labor and with no more than normal labor difficulties, the contractor would complete the work by the agreed upon completion date. However, as has been shown, the contractor did not have responsible labor, but had members of labor unions who acted like hoodlums; and because of their conduct, the contractor had an inordinate amount of abnormal labor difficulties. As stated above, the Army Contract Adjustment Board found that the bad conduct of labor caused work stoppages totaling 303 days. This resulted in so much delay that the project was not completed until October 19, 1968, which was 15 months and 19 days after the agreed upon completion date of June 30, 1967.

These facts show that the parties entered into the contract under a mutual mistake of material fact as to the length of time that would be required to complete the project.

### IV

### *Reformation of the Contract*

Where a mutual mistake of fact by contracting parties has been shown to

exist, this court, in the exercise of its equitable powers, has not hesitated to reform the contract. In Walsh v. United States, 102 F.Supp. 589, 121 Ct.Cl. 546 (1952) the contract provided that the contractor would pay the prevailing rate of $1.12 per hour for labor. It developed later that the prevailing rate was $1.20 per hour. It was clear that the parties had by mutual mistake contracted on the basis of a fact which did not exist. The court reformed the contract so as to allow the contractor to recover the increased cost for labor that he had to pay. The court said:

> * * * We think that, because of their mutual ignorance of a material existing fact, they made a writing which they would not have made but for that ignorance; that if they had been aware of the actual fact, they would have negotiated and contracted on that basis. We conclude, therefore, that the plaintiff may recover its additional labor costs of $16,171.44 [102 F.Supp. at 591, 121 Ct.Cl. at 554.]

A similar case was Poirier & McLane Corp. v. United States, 120 F.Supp. 209, 128 Ct.Cl. 117 (1954). In that case the parties contracted on the basis that the prevailing wage rate for labor was 85 cents per hour when it was actually $1.00 per hour. The court reformed the contract on the basis of mutual mistake of fact to reflect the actual wage rate. The court said:

> In any event, however, the parties contracted in the circumstances of this case under a mutual mistake of fact. Because of their mutual ignorance of the actual prevailing wage rate for unskilled laborers, as subsequently determined by the Secretary of Labor, the contract as executed did not reflect the true intent of the parties to the transaction. See Walsh v. United States, [102 F.Supp. 589,] 121 Ct.Cl. 546. * * * This court may, and it is its duty, in the exercise of its equitable jurisdiction, and for the purpose of awarding or refusing to award a money judgment against the United States, to reform the contract so as to

reflect the true understanding and intent of the parties to it. Sutcliffe Storage and Warehouse Co., Inc. v. United States, 112 F.Supp. 590, 125 Ct.Cl. 297, and cases there cited. We do so here by correcting the erroneous wage rate contained in the specifications, and basing our judgment on the contract as reformed. [120 F.Supp. at 214–215, 128 Ct.Cl. at 127.]

In Walsh and Poirier the mutual mistake of fact was the assumption and belief by the parties that particular wage rates existed as prevailing rates when in fact they did not so exist. In like manner, in our case, a mutual mistake of fact was the assumption and belief by the parties that adequate responsible labor existed in the project area that would perform the work in a responsible and timely manner when in fact such labor did not exist at all in that area. While the facts in these cases are different, the underlying principles as to mutual mistake of fact and reformation are common to all of them.

In Southwest Welding & Mfg. Co. v. United States, 373 F.2d 982, 179 Ct.Cl. 39 (1967), both parties to a contract made estimates as to the cost of steel based on $7.53 per 100 pounds which both parties believed the contractor would have to pay for it. The contract was signed on this basis. After the execution of the contract, the contractor discovered that the price of steel was $7.98 per 100 pounds instead of $7.53. The court held that there was a mutual mistake of fact and reformed the contract. The court held:

* * * Where there has been a mutual mistake of fact causing the terms of the written contract to depart from the parties' actual understanding, this court, like other courts, will normally grant reformation. See, e.g., Sutcliffe Storage & Warehouse Co. v. United States, 112 F.Supp. 590, 125 Ct.Cl. 297 (1953); Chernick v. United States, 372 F.2d 492, 178 Ct.Cl. 498 (1967). There is convincing evidence that such a mistake was present here. [373 F.2d at 989–990, 179 Ct.Cl. at 51.]

* * * * * *

Both parties, however, were guilty of mutual mistake—the burden of which currently rests on plaintiff alone. * * * The Government, also, although it had made cost estimates, was unaware that the contract had not represented the plaintiff's actual costs. The agreement, as written, conferred benefits upon the Government which neither party desired or intended.

Divergence of understanding from formal embodiment, such as this case reveals, is not at all novel, either in general contract litigation or in this court. Reformation of a contract to correct the parties' defectively expressed intention was the basis of the decision, for example, in Walsh v. United States, 121 Ct.Cl. 546, 102 F.Supp. 589 (1952). * * * The court reformed the contract. A similar situation exists here and the remedy of reformation is equally available.

The defendant claims that, at best, this is a case of the parties' common ignorance of the actual facts which, it argues, is never ground for reformation. See 5 Williston, Contracts § 1548, at 4341 (Rev.ed.1937). We are clear that this court has not adopted that broad a rule. * * * [Footnote omitted.] [373 F.2d at 990, 179 Ct.Cl. at 52–53.]

The court stated further:

* * * In allowing reformation in the *Walsh* case, *supra*, the opinion stated: "We think that, because of their mutual ignorance of a material existing fact, they [the parties] made a writing which they would not have made but for that ignorance; that if they had been aware of the actual fact, they would have negotiated and contracted on that basis." 102 F.Supp. at 591, 121 Ct.Cl. at 554. See also Poirier & McLane Corp. v. United States, 120 F.Supp. 209, 128 Ct.Cl. 117 (1954) (reformation granted where mutual mistake of fact was the parties' mutual ignorance of the actual prevailing wage rate for area laborers, resulting in costs above those stated in written

contract); National Presto Indus., Inc. v. United States, 338 F.2d 99, 167 Ct.Cl. 749 (1964), *cert. denied*, 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965), and cases cited. * * * [373 F.2d at 991, 179 Ct.Cl. at 53.]

It is true that the court in that case found that it was the intention of the parties that the government pay the cost of the steel regardless of what it was, and to that extent the case is distinguished on the facts from the instant case. However, the court's discussion of mutual mistake and reformation of contracts by reason thereof is especially applicable to the case before us. The statement by the court that this court has never adopted Williston's broad rule (5 Williston, Contracts § 1548, at 4341 (Rev.Ed. 1937)) that common ignorance of the actual facts is never ground for reformation, is especially significant in our case. Along the same line, the court quoted with approval the statement from the *Walsh* case (quoted above) that because of the mutual ignorance of a material existing fact the parties made a writing which they would not have made but for that ignorance, and that if they had been aware of the actual fact, they would have negotiated and contracted on a different basis, citing National Presto Indus., Inc. v. United States, 338 F.2d 99, 167 Ct.Cl. 749 (1964), cert. denied, 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965).

It is uncontroverted that the parties in the instant case were mutually ignorant of a material existing fact, namely the unavailability of responsible labor in the area of the project, as well as the exorbitant cost of such labor as was available. As stated in *Walsh*, because of this mutual ignorance, the parties made a contract they would not otherwise have made, and if they had been aware of the actual facts, they would have negotiated and contracted on a different basis.

The plaintiff in the instant case places its main reliance for recovery on our decision in National Presto Indus., Inc. v. United States, *supra*. In that case the plaintiff and the government entered

into a fixed-price contract for the manufacture by the plaintiff of artillery shells for the military. Prior to the signing of the contract, there was some discussion between the parties as to whether or not the shells could be produced by using what was known as the hot cup-cold draw system without the use of turning equipment known as plunge grinders or lathes to shave excess metal from the shells. The plaintiff thought it could not be done, but the government thought it could. However, the plaintiff finally agreed with the government's position, and, when the contract was signed it called for the use of the hot cup-cold draw system without the turning equipment. During performance, the plaintiff encountered difficulty in trying to produce the shells as specified in the contract without the use of turning equipment. Nevertheless, it continued its effort in this regard for a long time, but finally concluded the shells could not be produced without turning equipment. The contractor then used turning lathes and finished the contract. In the meantime, it had incurred a loss of over $700,-000 in trying to manufacture the shells in the manner specified in the contract. In due course it filed suit in this court to recover its loss, claiming, among other things, a mutual mistake of fact as to whether the shells could be produced as specified in the contract, and seeking reformation of the contract so as to require the government to pay for the loss. The court ruled that there was a mutual mistake of fact as to whether the shells could be produced without the turning equipment even though the contract did not mention such equipment, because neither party knew whether or not the shells could be thus manufactured. The court further found that the contract did not put the risk of this mistake on the contractor, and that even if the government had known of the mistake of fact in the beginning, it would have agreed to the contract and would have been willing to pay for part, but not all, of the testing and consequent expenses. The court reformed the contract and required the parties to share the loss.

While the facts are different in *Presto* and the instant case (usually no two cases have the same facts), the facts in the two cases showing mutual mistake of fact justifying reformation of the contracts appear to be substantially the same. In *Presto,* the mutual mistake of fact was that both parties were ignorant as to whether or not the shells could be produced by the hot cup-cold draw system without the use of turning equipment. As it turned out, this could not be done even though the contract required it. In our case, the principal mutual mistake of fact was that both parties were ignorant as to whether or not there was available to the contractor sufficient responsible labor in the area of the project to perform the required work. As it turned out, such labor did not exist.

In *Presto,* we prescribed four tests that must be satisfied before a contract can be reformed because of mutual mistake of fact. These are, in the words of the court, as follows:

> * * * To do justice here we need go no further than formulate and apply a rule for cases of mutual mistake in which the contract, properly construed, allocates the specific risk to neither party—and the side from whom relief is sought received a benefit from the extra work of the type it contemplated obtaining from the contract, and would have been willing, if it had known the true facts from the beginning, to bear a substantial part of the additional expenses. *Cf.* Virginia Engr. Co. v. United States, 101 Ct.Cl. 516, 532–533 (1944). [Footnote omitted.] 338 F.2d at 111–112, 167 Ct.Cl. at 769.]

These requirements, as applied to the instant case, are now considered:

(1) There must actually be a mutual mistake of fact by both parties. The existence of a mutual mistake of fact in three areas has been shown above in the instant case and no further discussion of this requirement is deemed necessary.

(2) It must be shown that the contract, properly construed, allocates the

specific risk to neither party. The plaintiff says that the contract is silent on this question and for that reason does not place the risk of available responsible labor on either party. The defendant, on the other hand, contends that clauses 5 and 13 of the contract place this risk on the plaintiff. These clauses provided as follows:

### 5. TERMINATION FOR DEFAULT—DAMAGES FOR DELAY—TIME EXTENSIONS

(a) If the Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in this contract, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the Contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. Whether or not the Contractor's right to proceed with the work is terminated, he and his sureties shall be liable for any damage to the Government resulting from his refusal or failure to complete the work within the specified time.

\* \* \* \* \* \*

(d) The Contractor's right to proceed shall not be so terminated nor the Contractor charged with resulting damage if:

(1) The delay in the completion of the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor, including but not restricted to, acts of God, acts of the public enemy, acts of the Government in either its sovereign or contractual capacity, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, or delays of subcontractors or suppliers arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and such subcontractors or suppliers; and

(2) The Contractor, within 10 days from the beginning of any such delay (unless the Contracting Officer grants a further period of time before the date of final payment under the contract), notifies the Contracting Officer in writing of the causes of delay.

The Contracting Officer shall ascertain the facts and the extent of the delay and extend the time for completing the work when, in his judgment, the findings of fact justify such an extension, and his findings of fact shall be final and conclusive on the parties, subject only to appeal as provided in Clause 6 of these General Provisions.

\* \* \* \* \* \*

### 13. CONDITIONS AFFECTING THE WORK

The Contractor shall be responsible for having taken steps reasonably necessary to ascertain the nature and location of the work, and the general and local conditions which can affect the work or the cost thereof. Any failure by the Contractor to do so will not relieve him from responsibility for successfully performing the work without additional expense to the Government. The Government assumes no responsibility for any understanding or representations concerning conditions made by any of its officers or agents prior to the execution of this contract, unless such understanding or representations by the Government are expressly stated in the contract.

As to clause 5, the argument of the defendant does not appear to be valid. It provides, in effect, that the govern-

ment cannot terminate the contract nor the contractor charged with the resulting damage if a delay occurs without fault or negligence of the contractor, including strikes. The defendant says that the mention of "strikes" in this paragraph makes the contractor responsible for every irresponsible, arbitrary, and capricious act and misbehavior of labor of every kind and character. This does not appear to be the meaning of clause 5. Considered as a whole, it simply means that if a strike (or other named event) occurs without fault or negligence of the contractor, the government cannot terminate the contract for delay and the contractor will not be liable for delay damages.

Neither does clause 13 put the risk of available responsible labor or of labor misconduct on the contractor. It requires him to make an on-sight inspection to determine conditions of work before bidding. The contractor here did so and consulted with labor leaders and unions and discovered nothing that would indicate in any way that an adequate supply of responsible labor would not be available for the project. The defendant does not contest these facts and in no way charges the contractor with negligence in this regard.

Consequently, it is clear that the contract does not allocate this risk to either party.

(3) The party from whom relief is sought must have received a benefit from the extra work or expense of the other party. In this case, counsel for the government admitted that it did indeed receive a benefit from the extra expense plaintiff had to pay for the irresponsible conduct and misbehavior of labor. It is obvious that this was true.

(4) The party from whom relief is sought (the government here) must be shown to have been willing, if it had known the true facts from the beginning, to bear a substantial part of the additional expenses. This requirement is more difficult than the others because it can only be resolved or satisfied by circumstantial evidence, which was actually what was done in the *Presto* case. In that case, the court concluded that the government would have been willing to bear a substantial part of the additional expenses for labor and delay if it had known the true facts from the beginning, because the government was interested in having the shells produced without turning equipment as provided in the contract. In our case, the government was vitally interested in having the Soo Lock constructed as provided in the contract. In fact, it was imperative that it be so constructed. The following facts show clearly that the government would have been willing to share in the additional labor and delay costs if it had known the true facts from the beginning. The evidence here that points to such willingness is many times stronger than in the *Presto* case. In fact, it appears that the government would have paid whatever costs that were required to build this lock. This is shown by the following.

The new second lock that the plaintiff contracted to build is located on the St. Mary's River, which connects Lake Superior and Lake Huron. At certain points in the river, the water falls 21 feet from the level of Lake Superior to the level of the lower lakes. The Soo Locks act as a water elevator to permit ships from the other Great Lakes to travel to and from Lake Superior. The evidence shows, as stated by the Comptroller General of the United States in his report to Congress (B–118634, October 19, 1966):

* * * The locks are important to the nation's economy because about two-thirds of the iron ore produced in the United States and Canada passes through these locks.

Also, the evidence shows that when the Panama and Suez Canals were in operation, more tonnage passed through the Soo Locks than the combined yearly totals of those canals. More than 100 million tons have passed through these locks annually since 1945. See Thomas Manse, The Soo Locks (1966).

The existing Soo Locks were inadequate because they were too small to

accommodate the larger ships. Also, there was danger that one of the larger ships would collide with and damage one of the gates of the existing locks and block the entire passageway. See Hearings and Reports, House of Representatives, Civil Functions, Department of the Army, 88th Cong., 1st Sess. 19 (1964), at 1983–84, and the report of the Comptroller General to the Congress, *supra.*

This evidence shows that the Soo Locks were vital to the national defense of the country and that it was imperative that the lock covered by plaintiff's contract be built as soon as possible. It is clear that the interest of the government in producing the artillery shells without turning equipment in *Presto* was minute when compared with its interest in the new Soo Lock. This was so because the shells could always be manufactured with turning lathes, which was the method finally used, but there was no alternate way for ships to pass to and from Lake Superior and the other Great Lakes. If the government could be said to have been willing to share the extra costs in *Presto* if it had known the true facts in the beginning, its willingness to share the additional costs in the instant case under the same circumstances can be said to have been a foregone conclusion.

Another circumstance showing the government would have been willing to share in or pay all of the extra costs if it had known the true facts in the beginning, was the fact that between 1959 and 1963 the Corps of Engineers of the United States Army decided to increase the size of the second new lock involved here and requested an additional $5,800,000 from Congress. The additional money was provided by Congress without any question. See Hearings, *supra,* at 1984 and 1986.

The defendant says that it is speculative to conclude that the government would have been willing to share in the extra expenses in this case if it had known the true facts in the beginning. The easy answer to this argument is that our decision in *Presto* mandates such a conclusion here. Furthermore, the total

extra costs here which plaintiff claims as a loss would be as nothing compared to annual appropriations for items of national defense, such as warplanes, tanks, submarines, battleships, and other defense items. Where would our national defense have been if the 85 percent of all iron ore produced in the United States and Canada that is used in making steel for our economy and implements of war had suddenly been denied passage between the Great Lakes because of damage to or inadequacy of the Soo Locks? The situation would have been grim indeed and perhaps catastrophic, and there would have been no doubt that the government would have paid whatever sum of money that was required to provide the necessary Soo Lock involved in this case.

Accordingly, it appears that every test required by *Presto* for reformation based on mutual mistake of fact has been met by the plaintiff in this case.

The defendant argues that if the contract is reformed in this case, the "floodgates of litigation" will be opened in cases of this kind. This is the same as saying "Pandora's box will be opened." This court answered this argument in *Presto* when it said:

* * * [W]e need not be stopped short [in reforming a contract for mutual mistake] by the fear of opening Pandora's box. * * * [338 F.2d at 111, 167 Ct.Cl. at 768–769.]

This court, in the exercise of its equitable powers, is quite capable of keeping cases of this kind in due bounds. A further reference to the decision of the court in *Presto* is appropriate at this point. There the court said:

* * * We are rightly admonished, in the region of mutual mistake, to seek just solutions. See 3 Corbin, *supra,* § 597, p. 583, esp. fn. 6, § 605, pp. 640–42, esp. fns. 94–95. * * * [338 F.2d at 111, 167 Ct.Cl. at 768.]

The principle function of this court is to see that justice is done, not only to the government, but also to persons asserting claims against it. Measured by this standard, we see in the instant case

a situation where neither party is at fault or guilty of negligence. Neither party accuses the other of any misrepresentation or overreaching. Both parties were ignorant of the fact that responsible labor did not exist in the area of the project. By reason of this fact, extra and additional expenses for labor and delay were incurred. At present, the loss has fallen on the contractor, but he says that the government should at least share in the loss. The question is presented squarely to the conscience of the court sitting as a court of equity. It appears that equity and justice is on the side of the contractor and that the fair, just, and equitable solution to the problem is to require the contractor and the government to share equally in the extra costs resulting from the irresponsible conduct and misbehavior of labor in this case, the exact amount of which will have to be proven by the contractor in a trial in this court. The following remarks by the court in the *Presto* case are significant in this regard:

> For such a case it is equitable to reform the contract so that each side bears a share of the unexpected costs, instead of permitting the whole loss to remain with the party on whom it chanced to light. In contract suits courts have generally seemed loath to divide damages, but in this class of case we see no objection other than tradition. Reformation, as the child of equity, can mold its relief to attain any fair result within the broadest perimeter of the charter the parties have established for themselves. Where that arrangement has allocated the risk to neither side, a judicial division is fair and equitable. The division can follow from the special circumstances if there are any; in their absence an equal split would fit the basic postulate that the contract has assigned the risk to neither party. [Footnote omitted.] [338 F.2d at 112, 167 Ct.Cl. at 769.]

The decision of this court in R. M. Hollingshead Corp. v. United States, 111 F.Supp. 285, 124 Ct.Cl. 681 (1953), supports the plaintiff's claim in the instant case. There a contract was made for the production of DDT concentrate that would not lose its clear color when stored in metal containers. After the contractor had manufactured the concentrate and stored it in metal containers, it lost its clear color. Later it developed that both the government and the contractor were ignorant of the fact that such concentrate could not be stored in metal containers without a resulting loss of its clear color. In other words, the parties were ignorant of a material existing fact and by reason thereof made a contract that was impossible to perform. The contractor was allowed to recover on his claim of mutual mistake of fact. In our case, the parties were ignorant of a material existing fact which made it impossible for the contract to be performed for the price and within the time agreed upon.

The defendant cites a number of cases, but they are not apposite here because a mutual mistake of a material fact did not exist in any of them. These cases relied on by the defendant are Flippin Materials Co. v. United States, 312 F.2d 408, 160 Ct.Cl. 357 (1963); Olin Mathieson Chemical Corp. v. United States, 179 Ct.Cl. 368 (1967); Evans Reamer & Machine Co. v. United States, 386 F.2d 873, 181 Ct.Cl. 539 (1967), cert. denied, 390 U.S. 982, 88 S.Ct. 1102, 19 L.Ed.2d 1279 (1968); Rolin v. United States, 160 F.Supp. 264, 142 Ct.Cl. 73 (1958); Stafford v. United States, 74 F.Supp. 155, 109 Ct.Cl. 479 (1947); George A. Fuller Co. v. United States, 63 F.Supp. 768, 105 Ct.Cl. 331 (1946); and United States v. Beuttas, 324 U.S. 768, 65 S.Ct. 1000, 89 L.Ed. 1354 (1945).

The *Flippin* case involved a land excavation contract where the government had knowledge of the underground conditions from the beginning and the contractor could have discovered them by examining the government's logs and charts. There was no mutual mistake of fact as to these conditions as claimed by the contractor.

In *Olin Mathieson,* three contracts were involved, one of which required the

contractor to supply fuel to the government. The contractor was the expert and had peculiar knowledge regarding the cost of producing fuel, but the government had no such knowledge or expertise. There was no mutual mistake of a material existing fact when the contracts were entered into, and the contractor's claim for increased production costs on that theory was denied.

In *Evans Reamer* the plaintiff was awarded a set-aside portion of a contract to make fire bombs with the clear understanding that ASPR 1–302.4 (rev. 1954) limited the contract price per unit to not more than the price paid for the non set-aside portion, which unit price had been established at $76.036. Later the contractor for the non set-aside portion of the contract applied to the Army Contract Adjustment Board for relief under Title II and the Board raised his price per unit to $87.9391. The set-aside contractor then applied to the Board for the same relief under Title II, but this request was denied by the Board. The contractor then sued in this court seeking reformation of the contract on the ground of mutual mistake of fact. The court correctly held that there was no mutual mistake of facts, because both parties had agreed that the contractor would receive the *award* price of $76.036 established for the non set-aside portion of the contract. Clearly, there was no mutual mistake as to a material existing fact. The case is inapposite here.

In the *Rolin* case the plaintiff entered into a contract to make an impedance measuring line with a base of Ni-Resist metal for the Bureau of Standards. He selected the metal to be used and manufactured the device using his own methods and procedures. He had represented to the government that he was possessed of the necessary knowledge, skill, and expertise to produce this instrument, which according to the record the government apparently did not have. When the device was finished, it was discovered that the base had warped. The plaintiff corrected it, but only after spending considerable time and money doing so. He lost money on the job and

sought reimbursement from the government. When his request was denied, he sued here for the extra costs claiming mutual mistake of fact. It was clear that there was no material existing fact about which the parties could have been mutually mistaken. The case has no application to the case before us.

The *Stafford* case is clearly inapposite here. In that case the plaintiff entered into a landscaping contract on a housing project. The government reserved the right to postpone a notice to proceed until the construction job (under a different contract) on the work site was completed. After being awarded the contract, the plaintiff requested the government to delay the notice to proceed for eleven months because he proposed to use non-union labor and he did not want labor trouble with the union employees being used on the construction job. When the notice to proceed was given, the plaintiff found out that his labor and other costs had increased over what they were when he was awarded the contract. He sought to hold the government responsible for this additional cost on the theory of breach of contract. The court denied him recovery on this phase of the case, although he was allowed a recovery for breach of contract on other claims not pertinent here. Mutual mistake of fact and reformation were not even involved in that case, so it has no application here.

Finally, in the *Fuller* and *Beuttas* cases cited by the defendant, the contract contained a provision that if the contractor paid wages in excess of the rates specified in the contract, the government would not consider any claims for additional compensation by reason thereof. The contractor did pay excess wages for labor and sought to collect the difference from the government. He was denied recovery. Mutual mistake of fact and reformation were not involved. These cases are not applicable nor controlling in the instant case.

The case before us has been well briefed and argued by able counsel for both parties. However, equity, fairness,

and justice requires that the contract be reformed.

I would reform the contract because of mutual mistake of material existing facts, and require the parties to share equally the increased costs resulting from the unavailability of responsible labor in the project area, and remand the case to the trial judge to determine the amount of such costs.

Accordingly, I would deny defendant's motion for summary judgment and grant plaintiff's cross-motion for summary judgment to the extent indicated herein, and remand the case to the trial judge for further proceedings consistent with this opinion.